**RURAL TELEPHONE COMPANY COALITION, Petitioner**

v.

**PUBLIC UTILITY COMMISSION, Respondent.**

**The Pennsylvania Telephone Association, Petitioner**

v.

**Public Utility Commission, Respondent.**

Commonwealth Court of Pennsylvania.

Argued Dec. 11, 2007.

Decided Jan. 24, 2008.

Regina L. Matz, Harrisburg, for petitioner.

Joseph K. Witmer, Asst. Counsel, Harrisburg, for respondent.

Mark D. Bradshaw, Harrisburg, for intervenor, Core Communications, Inc.

Norman J. Kennard, Harrisburg, for intervenor, Pennsylvania Telephone Association.

BEFORE: SMITH–RIBNER, Judge, SIMPSON, Judge, and FLAHERTY, Senior Judge.

OPINION BY Senior Judge FLAHERTY.

Rural Telephone Company Coalition (Coalition) and The Pennsylvania Telephone Association (Association) (collectively, Petitioners) petition for review of a decision of the Pennsylvania Public Utility Commission (Commission) which denied the protest Petitioners filed on July 18, 2005, granted the exceptions filed by Core Communications, Inc. (Core) to the initial decision of the administrative law judge (ALJ), reversed the decision of the ALJ and approved the application of Core to amend its certificate of public convenience to begin to offer, render, furnish or supply telecommunication services as a facilities-based competitive local exchange carrier to the public in certain service territories throughout Pennsylvania.[1] We affirm.

On May 27, 2005, Core filed an application with the Commission seeking approval to provide competitive residential and business local exchange and telecommunication services throughout the service territories of all rural local exchange carriers (RLECs). Notice of the application was published in the Pennsylvania Bulletin on July 2, 2005. Petitioners, who are RLECs, filed protests to Core's application on July 18, 2005.[2] Core filed an amended

---

1. The service territories in question are as follows: Armstrong Telephone Company—North, Armstrong Telephone Company—Pennsylvania, Bentleyville Telephone Company, Buffalo Valley Telephone Company, Citizens Telephone and Telegraph Company, Denver and Ephrata Telephone and Telegraph Company, Hancock Telephone Company, Hickory Telephone Company, Ironton Telephone Company, Lackawaxen Telecommunication Services, Laurel Highland Telephone Company, Mahanoy & Mahantango Telephone Company, Marianna & Scenery Hill Telephone Company, The North–Eastern Pennsylvania Telephone Company, North

Penn Telephone Company, Pennsylvania Telephone Company, Pymatuning Independent Telephone Company, South Canaan Telephone Company, Sugar Valley Telephone Company, Venus Telephone Corporation, West Side Telephone Company, and Yukon–Waltz Telephone Company.

2. The RLECs install the physical facilities (local loops, switches, trunks, interconnections, etc.) that connect customers to the world, allowing voice calling on a local and long distance basis and further, allowing customers' computers to connect to the internet, either across the basic voice phone line itself

application on August 22, 2005, correcting the defects identified by Petitioners that were in Core's original application.

On February 21 and 22, 2006, the ALJ held evidentiary hearings on Core's amended application. Petitioners maintained that Core is not providing a public utility service, is not offering "telecommunication" services, lacks the "facilities" needed to be a facilities-based competitor and is generally unfit.

Since 2000, Core has been certified by the Commission to provide facilities-based local exchange service in the service territories of Verizon Pennsylvania, Inc. (Verizon), Verizon North, Inc. (Verizon North) and the United Telephone Company of Pennsylvania d/b/a Sprint (Sprint).[3]

Core primarily markets services that provide connectivity between information service providers and the Public Switched Telephone Network (PSTN). Core's customers are integrated telephone service providers (ITSPs), Internet Service Providers (ISPs), inbound voice recognition providers, interconnection vendors, PBX installers and fax bureaus. Core's basic service is its Managed Modem Services, tariffed as a local exchange service in Pennsylvania since 2000, and is a replacement for Primary Rate Interface (PRI) service that ISPs purchase from incumbent telephone companies.

Core utilizes "virtual" NXX (VNXX) arrangements to provision local calling numbers for its customers.[4] Core intends to provision "loops" in the RLECs territories by leasing high capacity lines such as T–1 and T–3 lines that would connect one of Core's network locations to various locations in the RLECs' territories.

Core is seeking competitive local exchange carrier (CLEC) authority to expand and compete with the RLECs within their service territories. Core provides the competitive backdrop of the application by explaining that there is a robust, competitive market for telecommunication services geared toward ISPs in the non-rural parts of Pennsylvania. It explains that there is nothing unique about the service it provides in the non-rural part of Pennsylvania. Its competitors in these markets include Verizon, Qwest, Sprint, and other CLECs.

In the ISP markets, Core maintains that the RLECs and their affiliates are among its fiercest competitors. Core states that some of the RLECs are engaged in a rural edge-out strategy by which it is alleged that the RLECs leverage their financial resources and regulatory protections to expand into neighboring service territories. Core seeks certification as a CLEC because only with certification may it obtain interconnection pursuant to Section 251 of TA–96, 47 U.S.C. § 251, et seq.

Petitioners contend that Core is a wholesale ISP. Core accepts computer dial-up calls destined for the internet on behalf of

---

(dial-up) or by broadband facilities. All of the RLECs in this case have obligated themselves under Act 183, Act of November 30, 2004, P.L. 1398, *as amended,* 66 Pa.C.S. §§ 3011–3019, to provide broadband access in 100% of their territories no later than December 31, 2008. With respect to dial-up service, the RLECs all offer internet access. There are also a multitude of independently-owned local internet service providers (ISPs) operating in the RLECs' territories.

3. Sprint has recently changed its name to The United Telephone Company of Pennsylvania d/b/a Embarq Pennsylvania (Embarq).

4. NXX is the term referring to the seven digits that follow an area code. The NXX is used to identify a customer's number, the first three digits are the local carrier's central code and the last four are taken from blocks of numbers contained with the NXX. The NXX determines if the call is local or long distance.

retail ISPs that have sold internet access to the public. Core provides the following services to the ISPs: electronic recognition that an end user's computer browser is attempting to access the internet, translation of that call to internet language protocols, and delivery to the internet. Core changes the content of the call and grooms it to allow an end-user's computer to web browse or receive emails over the internet. Core does not sell to end-users directly, only to ISPs.

Core, by its application to the Commission, also claims that it operates on the telecommunication side of a dial-up call. This is where the issue arises. Certification as a CLEC by the Commission allows Core to obtain telephone numbers from the national administrator, to change the calling scope of those numbers, and to demand the free delivery of long distance calls to Core. Petitioners contend that Core is not a local exchange telephone company and that Core does not intend to invest in or lease facilities that would allow customers to call and be called on a local basis. There is no dial tone service by Core. Core's business plan is to terminate long distance computer calls destined for the internet on a toll free basis. Core asserts that any internet dial-up call within a local access and transport area (LATA) is a local call, irrespective of the location of the calling party and that party's local calling area.[5]

On June 8, 2006, the ALJ denied Core's application. The ALJ found in pertinent part as follows:

Despite the representations made in its Amended Application, evidence adduced at the Hearing in this case establishes that Core is not now, and would not be in the future, a facilities-based CLEC as that term has been understood in Pennsylvania since enactment of the Telecommunications Act of 1996.... [I]t is also the case that Core is not, and will not be, a "local exchange carrier."

\* \* \*

Because Core is not engaged in the provision of either "telephone exchange service["] or "exchange access," Core does not meet the definition of a "local exchange carrier" under Federal law.

Based upon the evidence in this case, Core's Amended Application seeking authority to be a "facilities-based competitive local exchange carrier" is a sham. Core is not now, and does not plan to be, a "facilities-based" carrier in the territories where it is certificated nor in the RLEC territories of the [Coalition] and [Association] companies where it seeks certification. Further, Core is not now, nor would it be while operating under its business plan, a local exchange telecommunications company (local exchange carrier) in accordance with Pennsylvania law. Even if Federal law were applicable, Core's operations do not meet the definition of a "local exchange carrier." [Petitioners] have contended that Core is, in fact, an ISP or an ISP aggregator. Whatever it may be, it is clear that Core is not, and would not be in the future, a facilities-based CLEC.

ALJ Decision, June 8, 2006, at 17–18, 21.

■ Core filed exceptions to the ALJ's decision on June 28, 2006. On December

---

**5.** A LATA is a defined geographic area which was designed to distinguish regional toll calling from national long distance services. There are six LATAs in Pennsylvania, as compared to hundreds of individual local calling areas. As such, the LATAs encompass a much greater area. Petitioners state that under state law and traditional Commission rules, intraLATA calls outside the local calling area have been toll calls and not local exchange service, as would be the case if Core's application is approved.

4, 2006, the Commission reversed the ALJ's decision and granted Core a rural facilities-based certificate of public convenience to provide CLEC service, pursuant to Section 1103(a) of the Public Utility Code (Code), 66 Pa.C.S. § 1103(a).[6] The Commission found that the public benefits in granting the application substantially outweigh those considerations interposed by Petitioners.[7] Petitioners filed separate appeals which were consolidated by this court.[8]

Petitioners contend that the Commission's decision was not supported by substantial evidence and contained errors of law, as it granted Core a certificate of public convenience as a CLEC based upon Core's current and proposed operations, which consist of accepting a computer telephone call (internet dial-up session) far outside the local calling area in order to convert and deliver the session to the internet when Core does not and will not originate and terminate calls within a local calling area. Petitioners also contend the Commission committed an error of law when it concluded that its scope of review of a rural facilities-based CLEC applica-

tion was "narrow," that Core was fit to provide CLEC service and that grant of the certificate was in the public interest.

■ First, Petitioners contend that the Commission's decision was not supported by substantial evidence and contained errors of law, as it granted Core a certificate of public convenience as a CLEC based upon Core's current and proposed operations, which consist of accepting a computer telephone call far outside the local calling area in order to convert and deliver the session to the internet when Core does not and will not originate and terminate calls within a local calling area.

Petitioners contend that Core is attempting to portray itself as something that it is not by presenting to the Commission an application that swore that it would provide a rural CLEC service. Petitioners contend that Core's proposed operations in the service territories of Petitioners' RLECs will be to provide free long distance dial-up access to Core's ISP customers and collect compensation from the RLECs for doing so. Petitioners believe

6. Section 1103(a) provides in pertinent part as follows:

Every application for a certificate of public convenience shall be made to the commission in writing, be verified by oath or affirmation, and be in such form, and contain such information, as the commission may require by its regulations. A certificate of public convenience shall be granted by order of the commission, only if the commission shall find or determine that the granting of such certificate is necessary or proper for the service, accommodation, convenience, or safety of the public. The commission, in granting such certificate, may impose such conditions as it may deem to be just and reasonable. In every case, the commission shall make a finding or determination in writing, stating whether or not its approval is granted. Any holder of a certificate of public convenience, exercising the authority conferred

by such certificate, shall be deemed to have waived any and all objections to the terms and conditions of such certificate.

7. The Commission, not the ALJ, is the finder of fact. *Popowsky v. Pennsylvania Public Utility Commission*, —— Pa. ——, 937 A.2d 1040 (2007). "[T]he Commission was the designated finder of fact, and its factually-based determinations are entitled to respect where ... they are supported by substantial evidence." *Id.* at 1059.

8. Our review in matters involving certificates of public convenience is limited to determining whether the Commission committed an error of law, whether substantial evidence exists to support the findings or whether constitutional rights have been violated. *Waltman v. Pennsylvania Public Utility Commission*, 142 Pa.Cmwlth. 44, 596 A.2d 1221 (1991).

that the Commission erred in granting Core's application and that the ALJ saw Core for what it was and properly denied the application.

Specifically, Petitioners contend that Core, in seeking a certificate of public convenience as a CLEC, to operate on the telecommunications side of a dial-up call, is seeking to gain a regulatory advantage to which ISPs are not legally entitled. The certification by the Commission allows Core the following: to obtain telephone numbers from the national administrator, to change the calling scope of those numbers, and to demand the free delivery of long distance calls to Core's back door, which is located many miles from the local calling area.

Section 102 of the Public Utility Code, 66 Pa.C.S. § 102, defines a public utility as:

(1) Any person or corporations now or hereafter owning or operating in this Commonwealth equipment or facilities for:

* * *

(vi) Conveying or transmitting messages or communications, except as set forth in paragraph (2)(iv), by telephone or telegraph or domestic public land mobile radio service including, but not limited to, point-to-point microwave radio service for the public for compensation.

Section 1102(a) of the Code authorizes the Commission to approve an application:

(1) For any public utility to begin to offer, render, furnish or supply within this Commonwealth service of a different nature or to a different territory than that authorized by:

(i) A certificate of public convenience granted under this part or under the former provisions of the act of July 26, 1913 (P.L. 1374, No. 854), known as

"The Public Service Company Law," or the act of May 28, 1937 (P.L. 1053, No. 286), known as the "Public Utility Law."

(ii) An unregistered right, power or privilege preserved by section 103 (relating to prior rights preserved).

66 Pa.C.S. § 1102(a). Section 1103(a) of the Code authorizes the Commission to approve an application "only if the commission shall find or determine that the granting of such certificate is necessary or proper for the service, accommodation, convenience, or safety of the public." 66 Pa.C.S. § 1103(a). Section 3019(a) of the Code provides that "[t]he commission may certify more than one telecommunications carrier to provide local exchange telecommunications service in a specific geographic location. The certification shall be granted upon a showing that it is in the public interest and that the applicant possesses sufficient technical, financial and managerial resources." 66 Pa.C.S. § 3019(a). Section 3013 of the Code defines a "local exchange telecommunications service" as "[t]he transmission of messages or communications that originate and terminate within a prescribed local calling area." 66 Pa.C.S. § 3012.

Core, in its amended application seeks to be certified as a "facilities-based local exchange" carrier. As such, Core must prove by a preponderance of the evidence that its service will be: a) facilities-based, and b) a local exchange service.

Core seeks to render its facilities-based local exchange service in the service territories of twenty-six RLECs. The Commission has traditionally required "distinctly independent networks" and allowed only CLECs willing to invest the capital to install and own its switches and transmission lines in the RLEC territories to become a facilities-based CLEC. Those CLECs relying on resale of RLECs installed and owned facilities to be able to

render service were not permitted to become a facilities-based CLEC. The ALJ found that Core did not intend to have a "facility" within the LATA.

Core is a CLEC headquartered in Annapolis, Maryland and has operations in eight states, including Pennsylvania. Core offers telecommunication services in, among other areas in Pennsylvania, Altoona, Erie, Harrisburg, Pittsburgh, Philadelphia and Wilkes–Barre LATAs. Core's services would be provided to a limited class of people, dial-up ISPs that need transmission path service and local numbers to provide access to the internet in the rural carriers' service territory. Core already provides transmission path service and numbering resources in Verizon's service territory in competition with the rural carrier Verizon. The record reflects that Core has installed switches in Altoona, Harrisburg, Philadelphia and Wilkes–Barre. Core's transmission path service originates and terminates dial-up calls to the internet by taking them from the rural carrier's service territory, using a tandem in the rural carrier's LATA, and then to Core's switch facilities located in Pennsylvania. From that point, Core hands the calls off to the ISP. Core contends, and the Commission agreed, that the use of some, but not all, of one's own facilities (in this case switches and a transmission path) makes a CLEC a facilities-based carrier.

The Commission found Core is a facilities-based CLEC in Pennsylvania stating in pertinent part as follows:

We conclude that Core has met its burden to establish that its operations are sufficiently facilities-based services. We are, therefore, able to further conclude

that Core will provide service over a distinctly independent network.

\* \* \*

We would agree with the observation of Core, that the use of a combination of facilities, including self-provisioning, leased, or resold, is acceptable in the current telecommunications environment. We, therefore, concluded that the deployment of a combination of facilities, in a variety of configurations, does not exclude the CLEC from being facilities-based. We would further agree with the argument of Core, that to the extent the CLEC is not wholly reliant on the resale of another carrier's (the incumbent's) services and has invested in facilities necessary for its subscribers to originate and terminate a call, we are able to find that the carrier qualifies as facilities-based. (Citations omitted).

Commission Decision, at 20–22. Core has assets of over $1,673,020 in Pennsylvania, including switching elements and Point of Presences (POPs). Core also leases transport circuits from fiber-based carriers to connect its POPs together as well as to other locations.[9] The Commission was correct in determining that Core is a "facilities-based" provider of telecommunication services.

Under Chapter 30 of the Code, a local exchange carrier must offer the transmission of messages or communications that originate and terminate within a prescribed local calling area for a fee to the public. Petitioners contend that this is not what Core does, nor is it what Core contemplates doing in the territories of the RLECs. Petitioners admit that Core currently owns and operates five switch equiv-

9. The Commission believes that a requirement that a switch be located in every rural carriers' service territory regardless of the population densities, service territories, or

economics runs the risk of preemption as a barrier to entry under Section 253(a) of TA–96.

alents (they do not admit that they are switches), all located in the territory of Verizon. Core leases capacity on other carrier's transmission lines to connect its ISP customers to Core's switch equivalents. Core provides no connections from end users to Core's ISP customers, but relies on the use of VNXX to permit its ISP customers to make a "local" telephone number available which uses the RLEC's facilities to connect the end user with the ISP. Therefore, Core offers its ISP customers to arrange for their end user customers to make a "local" call from Allentown to Philadelphia, a call that is not normally local. This transmission does not "originate and terminate within a prescribed local calling area." [10] Thus, Petitioners contend Core does not meet the definition of a "local exchange telecommunications company," a term considered synonymous with "local exchange carrier." Petitioners believe that dial-up calls to a fixed point to access the internet using local numbers outside a prescribed local calling area is beyond the Commission's jurisdiction.

Core, on the other hand, considers dial-up calls to a fixed point located outside a prescribed local calling area but within a LATA to constitute a local call so long as the NXX combination is properly rated as a local call. The Commission found that classification of the NXX, not the physical location of the NXX, is the basis used for determining if a call is local or long-distance. Thus, Core's placement of its NXXs within a LATA, but outside of the

rural carrier's local calling area, would still be a local call. Based on the above, the Commission properly determined that Core was a local exchange service.

Core complies with federal law as well. Federal law holds that transmission path service is a telecommunication service under the Code. *In the matter of Fiber Technology Networks, L.L.C. v. North Pittsburgh Telephone Company*, FCC File No. EB–05–MD–014, 22 FCC Rcd 3392, 2007 FCC Lexis 1593 (February 23, 2007), paragraphs 8–9, 24–26; at 2294–2295, 3400–3402 (Fiber Optics Order); *In the matter of DQE Communications Network Services, LLC v. North Pittsburgh Telephone Company*, FCC File No. EB–05–MD–027, 22 FCC Rcd 2112, 2007 FCC Lexis 1066 (February 2, 2007) (DQE Order) (collectively, FCC Pole Attachment Decisions). [11] The FCC Pole Attachment Decisions used definitions contained in the Code and other Commission decisions to determine that Pennsylvania's approach is consistent with federal law.

The FCC Pole Attachment Decisions hold that the offering of transmission path service on a non-discriminatory basis to the public by a common carrier is telecommunication service. The FCC Pole Attachment Decisions confirm that internet service is an information service, but that the transmission path needed to provide that internet service is a telecommunication service if the transmission path service is offered to the public by a common carrier. Thus, the Commission was cor-

---

10. We note that there is no definition of a prescribed local calling area in Chapter 30. Rural carriers' service areas are typically less than a LATA. The Federal Communications Commission (FCC) defines a prescribed local calling area for wireless service to be Major Trading Area—wide, which is even larger than a LATA. Core defines a prescribed local calling area as LATA-wide.

11. The FCC is the federal agency that regulates interstate and foreign communications by radio, television, telephone and telegraph; oversees radio, television, telephone and telegraph; oversees radio and television broadcasting standards, cable television operations, two-way-radio operators and satellite communications.

rect in determining that transmission path service is a telecommunication service under state and federal law.

The Commission further held that service to a limited class of the public constitutes a public utility service within the scope of the Commission's authority under the Code. *Waltman.* The Commission's decision gives Core the ability to provide an alternative transmission path service which connects the ISPs on Core's network to the PSTN from the central offices or tandems located in the rural carriers' LATA to a POP and out to the internet. This path provides an ISP with the ability to purchase transmission path service from a common carrier at state-approved tariff rates in order to connect the ISP to the PSTN, including the networks of the rural carriers in this appeal. In turn, the ISP can compete against the ISP of a rural carrier in the rural carriers' service territory. Thus, an ISP would be able to get transmission path service in the rural carriers' service territories from Core, and not just the rural carrier. The ISP would pay Core the established state-approved rate for the lines needed to provide access to the internet instead of paying the rural carrier. Core, in turn, gets reciprocal compensation from a rural carrier for the time that the ISP's dial-up customer is accessing the internet.

The problem arose because an ISP does not pay access or long distance rates to the carriers for the local service they need in order to provide dial-up access to the internet. The carrier cannot collect revenues from access rates because the FCC exempts enhanced service providers. This includes ISPs. The Commission did not err and its decision was supported by substantial evidence when it granted Core a certificate of public convenience as a CLEC.

■ Finally, Petitioners contend that the Commission's decision was not supported by substantial evidence and contained errors of law when it concluded that it had a narrow scope of review of a rural facilities-based CLEC application and that Core was fit to provide CLEC service and that the grant of such certificate was in the public's interest.

■ The Commission has explained its review of a rural facilities-based CLEC application as follows:

> Pursuant to TA–96 as well as our Implementation Order, the Commission's review of facilities based applications should be very narrow. The intent of TA–96 is to promote competition. Facilities-based service is competition in its truest sense and is clearly a part of what the Congress envisioned for the federal act.

*Petition For Streamlined Form of Regulation and Network Modernization Plan of Citizens Telephone Company of Kecksburg,* Pennsylvania Public Utility Commission Docket Nos. P–00971229, et al., 1999 Pa. PUC Lexis 61 (March 4, 1999) (Kecksburg). We also note that "[t]he propriety of permitting competition in any particular field is largely an administrative question to be decided by the Commission in the exercise of its discretion." *Waltman,* 596 A.2d at 1225.

The Code does not narrowly define what constitutes a "public utility" and Pennsylvania law does not narrowly construe what it means to make an offering to the "public" as well. Section 102 of the Code, 66 Pa.C.S. § 102, defines a public utility to be "any person or corporation now or hereafter owning or operating in this Commonwealth equipment or facilities for . . . conveying or transmitting messages . . . by telephone or telegraph . . . for the public for compensation. . . ."

In *Waltman,* our court addressed an application to provide high capacity, non-switched, dedicated circuits to a limited portion of the public. Our court found that the test for "public utility" and the phrase "for the public" was as follows:

Whether or not such person holds himself out, expressly or impliedly, as engaged in the business of supplying his product or service to the public, as a class, or to any limited portion of it, as contradistinguished from holding himself out as serving or ready to serve only particular individuals.

*Id.,* 596 A.2d at 1223. We further found that the "public" consisted of large commercial end-users and held as follows:

The applicants concede and the commission acknowledged that large volume users, including commercial entities and other common carriers, will probably be the only entities able to utilize the applicants' services. Although those businesses comprise a limited portion of the public, nothing in the record suggests that the applicants will limit their services to a select group of individuals. Rather, the record shows that the applicants' services are available to any prospective customer who has a need for and request them. Hence, substantial evidence supports the commission's pertinent factual findings.

*Id.,* 596 A.2d at 1225. Thus, in the present controversy, the Commission was correct in determining that Core was serving the public, as the public is not confined to the entire public. Offering a service to a limited class of customers constitutes public utility service.[12]

The Commission's approval allows Core to compete directly with similar services provided by the RLECs in their own service territory as well as Verizon's service territory. The approval expands Core's competition to the RLECs' service territories.

Petitioners also contend that Core was not fit to be a CLEC. The Commission has previously determined that:

Consistent with the pro-competition policies of state and federal law, henceforth, an applicant need only demonstrate fitness in order to obtain a certificate to provide facilities-based telecommunications service in the territory of an R[L]TC. Given the Commission's policy favoring facilities-based competition, when future applicants establish their fitness, then approval of their application would be necessary and proper to further the public interest, as required by 66 Pa.C.S. § 1103(a).

*Application of AT & T Communications of Pennsylvania, Inc. and TCG Pittsburgh,* Pennsylvania Public Utility Commission Docket Nos. A–310125F0002; A–310213F0002, 2001 Pa. PUC Lexis 11, 37 (April 10, 2001). The Commission's test for fitness is set forth as follows:

1. Technical expertise—Applicant must have technical capacity to meet the need in a satisfactory fashion.... Applicant must posses[s] sufficient staff, facilities, and operating skills, to make the proposed service feasible, profitable, and a distinct service to the public....

2. Financial capacity—Applicant should possess the financial ability to give reliable and responsible service to the public.... Applicant should own or should have sufficient financial resources to obtain the equipment needed to perform the proposed service.

---

12. Core's telecommunication service does not include voice service, but consists of offering a transmission path and local numbering services to ISPs to facilitate the ISPs offering of dial-up access to the internet.

3. Propensity to operate safely and legally—In this regard, lack of fitness is demonstrated by persistent disregard for, flouting, or defiance of the Public Utility Law and the commission's orders and regulations ... and by violations in matters affecting the safety of operations.... In the case of applicants who already possess operating authority, past performance should be analyzed to determine whether applicant has obeyed the Public Utility Code and commission regulations, particularly those regulations dealing with public safety. For applicants who do not possess operating authority, the commission may consider any evidence which would bear upon the applicant's propensity to operate a public utility safely and legally.

*Re William O'Connor,* Pennsylvania Public Utility Commission Docket No. 100429, 1980 Pa. PUC Lexis 10, 54 Pa. PUC 547 (November 20, 1980) (citations omitted).

A CLEC applicant that is currently providing services in Pennsylvania has a rebuttable presumption of fitness to provide services in other portions of Pennsylvania. *AT & T/TCG,* at 17. The Commission correctly ruled that Core was entitled to such presumption of fitness to expand its current services from Verizon's service territory into the RLECs' service territory. The RLECs then had the burden of rebutting the presumption of fitness. The Commission found that they did not meet this burden.

The record reflects that Core is technically and managerially fit to expand its telecommunication services. Core connects and terminates thousands of calls each month and has several switches located throughout Pennsylvania. There is no record of any customer complaints filed with the Commission by Core's end-users, no officer has been accused or convicted of a crime involving fraudulent activity and

Core has not violated any significant public health or safety requirements of the Commission.

Petitioners claim that Core is not fit as it does not provide the full panoply of services provided by the RLECs. However, this duplication of services is not required by the Commission.

The record also reflects that Core is financially fit to expand its telecommunication services. Core currently operates in Verizon's service territories and has submitted annual reports that demonstrate strong revenue and profits. Although Petitioners claim that the Commission should take away reciprocal compensation revenues, this argument is not relevant to a determination of financial fitness, as, at present, reciprocal compensation is permitted by the Commission.

Petitioners further claim that Core is legally unfit, as Core was the subject of sanctions by the Commission in the past with regard to its numbering practices. Core notes that other CLECs were subject to these sanctions and such sanctions did not result in a finding of being unfit. The Commission found the sanctions a matter of minor concern. We agree with the Commission.

The Commission did not err and its decision was supported by substantial evidence. Accordingly, we affirm the decision of the Commission.

### ORDER

AND NOW, this 24th day of January, 2008, the Order of the Pennsylvania Public Utility Commission in the above-captioned matter is affirmed.