# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Crown Castle NG East LLC and : 
Pennsylvania-CLE LLC, : 
              Petitioners : 
               : 
         v. :   No. 697 C.D. 2017
               :   Argued: February 7, 2018
Pennsylvania Public Utility : 
Commission, : 
              Respondent : 


BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge
                HONORABLE RENÉE COHN JUBELIRER, Judge
                HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE ANNE E. COVEY, Judge
                HONORABLE MICHAEL H. WOJCIK, Judge
                HONORABLE CHRISTINE FIZZANO CANNON, Judge
                HONORABLE ELLEN CEISLER, Judge


OPINION BY
JUDGE COHN JUBELIRER           FILED: June 7, 2018


The Petitioners in this case operate neutral-host Distributed Antenna System (DAS) networks, which are used by various wireless companies to transport wireless data and voice traffic. For 10 years, the Pennsylvania Public Utility Commission (Commission) certificated DAS networks as public utilities. On March 17, 2017, the PUC issued an Order (DAS Order) in which it reversed its longstanding practice, finding that DAS network operators are not public utilities under the Pennsylvania Public Utility Code (Code)[1] and, therefore, are not within the Commission's

---

[1] 66 Pa. C.S. §§ 101-3316.

jurisdiction. After the Commission denied reconsideration of the DAS Order, Petitioners Crown Castle NG East LLC and Pennsylvania-CLE LLC (together, Crown Castle), petitioned for review of the Commission's Orders. While the facts may be quite technical, the legal principles involved are straightforward. After reviewing the relevant language in the Code, this Court's precedent, the decisions related to the certification of DAS networks by public utility commissions in other jurisdictions, and relevant federal law, we conclude the Commission erred in its interpretation of the Code to exclude DAS network operators from the definition of public utility, and, accordingly, we reverse.

## I.     Background

### A.     DAS Networks

Generally, neutral-host DAS networks provide transport services to their Wireless Service Provider (WSP) customers, such as AT&T Wireless or Verizon Wireless, via the networks' fiber optic lines, which run between remote, fixed-point "nodes" and a centrally-located "hub."[2] The DAS network works in conjunction with the facilities and equipment owned by the WSPs and the WSPs' retail customer, the cell phone or smart phone user, to provide transport to wireless communication. DAS networks essentially provide increased coverage and/or capacity within a localized area by collecting wireless traffic from a WSP's retail end-user, transmitting it over the DAS network (typically using terrestrial fiber optic lines) and delivering it back to the WSP's network. An advantage of a DAS network is that it "us[es] components that are a fraction of the size of macrocell deployments, [that] can be installed – with little or no impact – on utility poles, buildings, and

_____

[2] WSPs can operate their own DAS networks that serve only their retail end-user customers.

2

other existing structures." *In Re: Acceleration of Broadband Deployment by Improving Wireless Facilities Siting Policies*, 29 FCC Rcd. 12865, 12867 (F.C.C. 2014) (*2014 Wireless Infrastructure Order*). "DAS deployments offer robust and broad coverage without creating the visual and physical impacts of multiple macrocells." *Id.* at 12879. They can be deployed in "densely populated urban areas, where traditional towers are not feasible or in areas, such as stadiums, where localized wireless traffic demands would require an unrealistic number of macrocells." *Id.* at 12880. DAS networks may be owned and operated by a WSP for the sole use of its customers, or owned and operated by a neutral-host, such as Crown Castle NG East LLC, which may lease its network to multiple WSPs.

B.      *The Commission's Treatment of DAS Networks from 2005 to 2015*

Between 2005 and 2015, the Commission granted certificates of public convenience (Certificate) to DAS network operators as competitive access providers (CAPs)[3] on the basis that they were public utilities under subsection (1)(vi) of the definition of public utility under the Code:

> (1) Any person or corporations now or hereafter owning or operating in this Commonwealth equipment or facilities for:
>
> ***
>
> (vi) Conveying or transmitting messages or communications, except as set forth in paragraph (2)(iv), by telephone or telegraph or domestic public land mobile radio service including, but not limited to, point-to-point microwave radio service for the public for compensation.
>
> ***
>
> (2) The term does not include:

---

[3] "CAP service . . . [i]s a dedicated point-to-point or multipoint service; voice or data." *In Re: Review of Issues Relating to Comm'n Certification of Distributed Antennae Sys. Providers in Pa.*, No. M-2016-2517831 at 3 n.5 (Pa. P.U.C. 2016) (internal quotation marks omitted).

*** 

(iv) Any person or corporation, not otherwise a public utility, who or which furnishes mobile domestic cellular radio telecommunications service.

Section 102 of the Code, 66 Pa. C.S. § 102. At least five DAS network operators, including Crown Castle,[4] were granted Certificates by the Commission during that time period.

In 2015, during the Commission's consideration of an application for a Certificate filed by the DAS network operator SQF, LLC, (SQF), two members of the Commission began questioning the Commission's historical treatment of DAS network operators as public utilities under subsection (1)(vi) of the Code. *See Appl. of SQF, LLC for Approval to Offer, Render, Furnish or Supply Telecomm. Servs. as a Competitive Access Provider to the Pub. in the Commonwealth of Pa.*, No. A-2015-2490501 (Pa. P.U.C. 2015), Statements of then-Vice Chairman John F. Coleman, Jr., and former-Commissioner Robert F. Powelson.[5] If DAS networks' operators were not public utilities under subsection (1)(vi), they stated, then the

---

[4] Crown Castle NG East LLC originally received a Certificate under the name NextG Networks of NY, Inc., but subsequently changed its name. (Crown Castle's Comments at 1 n.1, Reproduced Record (R.R.) at 52a.) Pennsylvania-CLE LLC also received a Certificate and, as a result of a merger, both Crown Castle NG East LLC and Pennsylvania-CLE LLC are "wholly-owned subsidiaries of a common parent." (*Id.*) Throughout the country, Crown Castle owns and operates "shared telecommunications infrastructure" in the amount of 15,000 DAS and small cell installations, and more than 16,000 miles of fiber optic lines, and provides telecommunications services via DAS networks. (*Id.* at 53a.) Crown Castle currently holds Certificates or the equivalent in 46 states and in Puerto Rico and the District of Columbia, and it provides DAS networks in more than 35 communities throughout Pennsylvania. (*Id.*)

[5] These statements are available at http://www.puc.state.pa.us/pcdocs/1392246.pdf and http://www.puc.state.pa.us/pcdocs/1392235.pdf (last visited June 6, 2018). Vice Chairman Coleman served in that position until December 31, 2015, and remains on the Commission. Commissioner Powelson is no longer a Commission member having been appointed to the Federal Energy Regulatory Commission.

4

Commission did not have jurisdiction to regulate or issue Certificates to those operators. *See id.*; Section 501 of the Code, 66 Pa. C.S. § 501 (setting forth the Commission's general powers to, *inter alia*, supervise and regulate all public utilities in the Commonwealth). The Commission granted a Certificate to SQF, but directed the opening of formal proceedings to investigate the question of whether DAS network operators were public utilities over which the Commission had jurisdiction.

### C. The Commission's 2016 Investigatory Proceedings

In February 2016, the Commission opened a formal investigatory proceeding on the jurisdictional question. In particular, this question was whether DAS network operators were public utilities under subsection (1)(vi) as an entity that conveyed or transmitted messages or communications, as they had been historically treated, or fell within the exclusion from that definition set forth in subsection (2)(iv) for "[a]ny person or corporation, not otherwise a public utility, who or which furnishes mobile domestic cellular radio telecommunications service." 66 Pa. C.S. § 102. The term "mobile domestic cellular radio telecommunications service" is not defined in the Code, but has been considered synonymous with the term "commercial mobile radio service" (CMRS), (Reproduced Record (R.R.) at 18a n.4), which is defined by Section 20.3 of the federal telecommunications regulations (Federal Regulations), 47 C.F.R. § 20.3.[6] Traditionally, it is the WSPs that provide CMRS to **their** retail

---

[6] CMRS is defined as "[a] mobile service that is: (a)(1) provided for profit, i.e., with the intent of receiving compensation or monetary gain; (2) [a]n interconnected service; and (3) [a]vailable to the public, or to such classes of eligible users as to be effectively available to a substantial portion of the public." 47 C.F.R. § 20.3. In pertinent part, an "interconnected service" is "[a] service: (a) [t]hat is interconnected with the public switched network, or interconnected with the public switched network through an interconnected service provider, that gives subscribers the capability to communicate to or receive communication from other users on the

5

cell phone customers, because CMRS is an interconnected, mobile wireless communication service that is provided to the public for profit. Vice Chairman Coleman and Commissioner Powelson suggested that DAS network operators were, in actuality, furnishing CMRS because the services and infrastructure the DAS network operators offered to their WSP customers could not be separated from the federally-regulated CMRS the WSPs offered to their own retail end-users. Under this interpretation, they contended, the services provided by DAS network operators were outside the Commission's jurisdiction.

The investigation did not include a hearing, and, instead, the Commission requested comments and reply comments from stakeholders regarding whether: "DAS [operators] are public utilities under Pennsylvania law that can be certificated"; "the Commission should or is required to certificate these carriers in furtherance of federal law"; "DAS service is an interstate service, intrastate service, or both"; and "a C[ertificate] is needed to confer property rights to DAS [operators] to site the facilities/equipment used to provide DAS service, including access to rights-of-way and eminent domain."[7] (R.R. at 19a.) Further, the stakeholders were to address in their responses whether DAS network operators furnish CMRS, thereby precluding them from being a public utility under subsection (2)(iv).

---

public switched network[.]" *Id.* "Mobile service" is "[a] radio communication service carried on between mobile stations or receivers and land stations, and by mobile stations communicating among themselves . . . ." *Id.* "Radio communication" "means the transmission by radio of writing, signs, signals, pictures, and sounds of all kinds, including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission." Section 153(40) of the Federal Telecommunications Act of 1996 (Federal Act), 47 U.S.C. § 153(40). A "'mobile station' means a radio-communication station capable of being moved and which ordinarily does move." Section 153(34) of the Federal Act, 47 U.S.C. § 153(34).

[7] The Commission set forth additional questions for stakeholders to answer in an appendix to the February 2016 Order.

6

Numerous stakeholders responded. Crown Castle and ExteNet Systems, Inc.[8] (ExteNet) and organizations representing DAS network providers and owners of telecommunications facilities, including CTIA – The Wireless Association (CTIA) and PCIA – The Wireless Infrastructure Association (together, Industry Stakeholders), responded with comments. Also responding were the Pennsylvania Municipal League, the Pennsylvania State Association of Township Supervisors, the Pennsylvania State Association of Boroughs, and the Pennsylvania State Association of Township Commissioners (together, Municipal Stakeholders). Finally, the Office of Consumer Advocate (Consumer Advocate) offered comments.

Industry Stakeholders indicated that DAS network operators should retain their status as public utilities under subsection (1)(vi) as intrastate telecommunications service providers, as they historically have been treated by the Commission and numerous other jurisdictions. Industry Stakeholders maintained that DAS network operators were not furnishing CMRS because they do not offer mobile or wireless services regulated by the Federal Communications Commission (FCC). Rather, DAS network operators offer wholesale point-to-point transport services to WSPs, similar to those that were considered certificated telecommunications services in *Rural Telephone Company Coalition v. Pennsylvania Public Utility Commission*, 941 A.2d 751 (Pa. Cmwlth. 2008). Although pursuant to Section 224 of the Federal Telecommunications Act of 1996 (Federal Act), 47 U.S.C. § 224 (addressing pole attachments for wireless facilities), and FCC rulings, DAS network operators should be permitted access to municipal and public utility rights-of-way to install DAS network facilities, Industry Stakeholders stated they often needed to show a Certificate before being granted that

---

[8] ExteNet Systems, Inc. (ExteNet) is a DAS network operator that holds a Certificate in Pennsylvania and is also certificated in 35 states. (ExteNet's Comments at 3, R.R. at 106a.)

access. Even potential clients, they indicated, have requested proof of a DAS network operator's Certificate before entering into an agreement with the operator. Industry Stakeholders also commented that not providing DAS network operators with Certificates, or stripping them of their existing Certificates, could violate Section 253 of the Federal Act, 47 U.S.C. § 253,[9] by impeding the operators' ability to compete in a fair and balanced regulatory environment.

Municipal Stakeholders took the position that DAS network operators were expressly excluded from the definition of public utilities because they provide interstate CMRS. According to Municipal Stakeholders, DAS network operators provide CMRS because they facilitate traditional CMRS services. They contended that continuing to grant Certificates to DAS network operators is inconsistent with Commission precedent and with *Rural Telephone* because those operators do not connect to the Public Switched Telephone Network (PSTN) and are primarily interstate telecommunications CMRS falling within the FCC's regulatory purview. Municipal Stakeholders stated that federal law and Pennsylvania's Wireless

---

[9] Section 253(a) of the Federal Act provides, in pertinent part, "No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." 47 U.S.C. § 253(a). Section 253(b) states:

> Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this title, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

47 U.S.C. § 253(b). Section 253(c) allows a "State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government." 47 U.S.C. § 253(c).

Broadband Collocation Act[10] amply protects DAS network operators' ability to site DAS facilities within public rights-of-way or on existing public utility facilities, and they were unaware of any municipality or public utility requiring DAS network operators to obtain a Certificate before allowing the placement of DAS facilities. They further claimed that federal law does not require the Commission to issue Certificates to DAS network operators, and the denial or rescission of Certificates to those operators will not violate Section 253 of the Federal Act or any other federal law. Granting Certificates, which confer an exemption from local zoning and the power of eminent domain, to DAS network operators, Municipal Stakeholders stated, would have a detrimental effect on local and state governments.

Consumer Advocate commented that DAS network operators were better classified as providing interstate wholesale CMRS service than as a public utility. Consumer Advocate posited that the Commission was not required by federal law to issue Certificates to DAS network operators, and that DAS network operators already have access to pole attachments under federal law. However, Consumer Advocate was in favor of each certificated CAP being reviewed to determine whether it otherwise qualified as a public utility.

Industry Stakeholders submitted responses to the comments of Municipal Stakeholders and Consumer Advocate reiterating their earlier arguments, adding that DAS network operators do not meet the federal definition of CMRS and pointing out that those operators do not provide wholesale or other CMRS services but **intrastate transmission or transport path** services to wireless carriers. PCIA observed that finding an entity that **facilitates** traditional CMRS services to be a CMRS **provider** would re-define numerous providers of non-DAS types of

---

[10] Act of October 24, 2012, P.L. 1501, 53 P.S. §§ 11702.1-11702.6.

telecommunication services, such as traditional backhaul service[11] providers, as CMRS providers, an outcome that should be avoided.

## II.   The Commission's 2017 DAS Order

After considering the comments and reply comments, the Commission entered the DAS Order on March 17, 2017,[12] reversing its historic treatment of DAS network operators based on the Commission's finding that they were not public utilities because their "facilities furnish mobile domestic cellular radio telecommunications service" and, therefore, were not subject to the Commission's jurisdiction or entitled to a Certificate.  (DAS Order at 1, 33, 35.)  The Commission provided technological and legal explanations for its conclusion that DAS network operators fall within the exclusion set forth in subsection (2)(iv).

Technologically, the Commission found that DAS networks consist of:  (1) a "[p]owered antenna[] and related signal conversion equipment" to receive and transmit end-user wireless traffic and to convert the information (Node); (2) "[s]ome form of 'terrestrial' transport (most likely fiber) that carries the traffic between the DAS and WSP networks"; and (3) a connector "between the two networks, usually located at the WSP's switch or carrier hotel" (Hub).  (*Id.* at 11.)  The DAS network antennas are located on existing utility poles, municipal light posts, buildings, and other structures frequently in a public right-of-way – but, the Commission explained, DAS network operators can also construct their own poles and facilities.

---

[11] Backhaul service is the transport of traffic between a wireless carrier's tower-mounted antennas and the wireless carrier's facilities.  (CTIA's Reply Comments at 3, R.R. at 208a.)

[12] The DAS Order was adopted on March 2, 2017, but was not entered until March 17, 2017.

The Commission found that "DAS networks provide infrastructure on the end-user side of the traditional CMRS carrier's network" by allowing WSPs, which are CMRS carriers and the DAS network's customer, "to expand their networks in a fast, cost-effective, and efficient manner." (*Id.* at 10-11 (quoting ExteNet's Comment at 2).) The Commission recognized that it is the **WSP**, not the DAS network operator, that exchanges the voice traffic to the PSTN and is responsible for the hand-off to 911 emergency centers, with other carriers, or the PSTN. Similarly, phone numbers are a part of the WSP's function and are not needed for the operation of the DAS network. Notwithstanding this, the Commission observed that the DAS networks **are used** to connect the WSP's retail end-user customer with the WSP's network, which, in turn, is connected with the PSTN. (*Id.* at 22.) Thus, technologically, it found a link between the PSTN and the DAS network.

Legally, the Commission cited the Code's statutory language, as well as relevant Federal Regulations and FCC rulings, to determine that DAS network operators were outside the Commission's jurisdiction. Looking at the statutory definitions in the Code, the Commission acknowledged that DAS network operators met the initial legal definition of public utility because they operate "facilities that convey or transmit messages or communications." (*Id.* at 14.) However, the Commission concluded that "DAS networks should be defined by their functionality," and DAS equipment "plays a vital and active role in the wireless session by providing [the] antenna[s] that directly interface[] with the end-user's wireless device" as it both sends and receives the radio signal. (*Id.* at 18.) Focusing on this point and the use of the DAS network equipment, the Commission read subsections (1)(vi) and (2)(iv) together and construed the Code's definition of public utility as excluding "any person that operates equipment that 'furnishes mobile

11

domestic cellular radio telecommunications service.'" (*Id.* (quoting 66 Pa. C.S. § 102).) This definition, according to the Commission, did not require "that the service be a stand-alone offering." (*Id.*) Turning to the dictionary, the Commission observed that to "furnish" means "to provide" or "to supply." (*Id.*) Applying those definitions, the Commission concluded that DAS network facilities **are used** to supply and provide personal wireless services to the WSPs' customers. (*Id.*) Because DAS network operators operate equipment that **is used** to furnish CMRS to the WSPs' customers, the Commission held that they **also furnished** "mobile domestic cellular telecommunications service." 66 Pa. C.S. § 102. Therefore, it concluded, DAS network operators were expressly excluded from the definition of public utility and could not "be certificated as public utilities under the Code." (DAS Order at 23.)

The Commission looked for additional support for this conclusion in the Federal Regulations defining CMRS and in the FCC's rulings related to siting wireless facilities. Noting that DAS network facilities "utilize wireless (radio) technology in order to provide personal wireless service" via the Nodes and Hubs, and provide both a mobile and interconnected service through their relationship with the WSPs and the WSPs' end-user customers, the Commission found DAS networks provided CMRS under the Federal Regulations. (*Id.* at 16, 21-22.) The Commission found further support for its conclusion in the *2014 Wireless Infrastructure Order*, in which the FCC expanded certain siting advantages available to wireless facilities under the Federal Act and prior FCC rulings to DAS facilities "to the extent . . . [those] facilities . . . are or will be used for the provision of personal wireless services." (*Id.* at 15-16 (quoting *2014 Wireless Infrastructure Order* at 12973) (emphasis omitted).) Relying on this statement, the Commission concluded that the

12

FCC classified DAS networks as "a provider of 'personal wireless service'" under federal law, and, therefore, subject to the FCC's regulations. (*Id.* at 16.)

The Commission considered Industry Stakeholders' assertions that DAS networks did not provide "wireless" services and that changing course would lead to adverse consequences to the industry and a violation of federal law, but found them unpersuasive. It was unpersuaded by the suggestion that DAS networks provide landline service, via the use of fiber optic lines. The Commission found this to be "an incomplete description of the DAS network" that was "unreasonably restrictive" because the DAS network's Nodes actively transmit or receive radio frequency (RF) signals from the wireless end-user customer and convert the RF signals to digital or optical format to be transported over the network's fiber optic lines. (*Id.* at 16-17.) The Commission was similarly unpersuaded by claims regarding the potential adverse impact, observing "that the primary adverse consequence of the possible decertification of DAS networks raised by any party relates **solely** to facilities siting - gaining access to public rights-of-way and zoning permits to deploy new facilities or to connect to existing structures." (*Id*. at 23 (emphasis in original).) It held, however, that because DAS networks were covered by the Federal Act and FCC's rulings related to siting, there are existing provisions guaranteeing DAS network operators the ability to attach their equipment to public utility poles, place equipment in public rights-of-way, and avoid unreasonable zoning restrictions. Finally, the Commission was not persuaded that it was compelled by federal law to issue Certificates to an entity that did not qualify as a public utility under the Code and there would be no violation of federal law because it could not "see how allowing DAS networks to operate free from Commission oversight form[ed]" a competitive barrier to market entry. (*Id.* at 23.)

13

For these reasons, the Commission held that DAS network operators were not public utilities under the Code and were not entitled to Certificates for the operation of their DAS network facilities. Thus, the Commission declared that: it would no longer issue Certificates to DAS network operators; existing DAS network facilities would not be affected by the DAS Order but Certificates could not be used (and were not needed) to construct new DAS network facilities; and the Commission's staff would review the existing Certificates granted to DAS network operators to determine whether the Certificates should be rescinded. (*Id.* at 35-36.)

Chairman Gladys M. Brown dissented. She observed that for over 20 years, Certificates were granted to CAPs, which have included the wholesale telecommunications transport services provided by DAS network operators. That practice, according to Chairman Brown, should continue regardless of the technological means by which those transport services are provided. She explained that "DAS is the next generation of wholesale transport service needed to offload astronomical increases in the demand for the broadband needed to carry voice calls and access the internet, both of which are telecommunications service[s] under federal law." (DAS Order, Dissenting Statement of Chairman Gladys M. Brown at 2.) Thus, Chairman Brown disagreed with the DAS Order that "any use of wireless technology by any DAS [operator] prohibit[ed] the Commission from granting C[ertificates]." (*Id.* at 1.) Chairman Brown explained that "[t]he Commission must distinguish between the DAS [operators'] common carrier wholesale telecommunications service which relies on fixed wireless technology, which is within the Commission's jurisdiction, from the retail mobile wireless service sold to consumers that is not regulated by the Commission under Section 102." (*Id.*) The DAS operators, she stated, rely partially on wireless technology, but own no

14

spectrum, need no phone numbers, and serve all carriers. This is unlike retail wireless companies, the WSPs, which serve only their own customers, own spectrum, and need phone numbers to operate. Chairman Brown observed that DAS networks provide indirect transport to the PSTN not only to wireless calls, but also to wireline calls and 911 calls. The harm, she asserted, in refusing to grant Certificates to DAS network operators, could not be overstated. The refusal to grant Certificates to these DAS network operators could negatively impact the resolution of conflicts between local municipalities and DAS network operators, future investment in DAS networks in Pennsylvania, and the ability of neutral DAS network operators to compete. (*Id.* at 2.) According to Chairman Brown, "[c]ontinuing the practice of granting C[ertificates] to DAS [network operators] is more consistent with federal and state law especially in light of [the Commission's] prior practice and overwhelming comments in support of certification." (*Id.* at 1.)

Now-Vice Chairman Andrew G. Place also disagreed. He stated "[t]here is no technical or legal reason to discontinue the past practice of the Commission in granting such applications" so long as the DAS network operator meets "the requisite statutory and regulatory requirements under applicable Pennsylvania and federal law." (DAS Order, Dissenting Statement of Vice Chairman Andrew G. Place at 1.) He concluded that the Commission's current practice of granting Certificates to DAS network operators as telecommunications carriers was consistent with the Federal Act, Pennsylvania law, adjudications, and appellate decisions. (*Id.*) According to Vice Chairman Place, these "actions have facilitated wholesale interconnection arrangements and agreements between competing telecommunications carriers," which have had "beneficial effects for employment, economic development, and new business models." (*Id.* at 2.) Vice Chairman Place

15

noted that DAS network operators' use of technology and architecture "for the wholesale transport of telecommunications and communications traffic does not technically and legally remove them from the Commission's jurisdiction" or transform those operators into WSPs or CMRS providers. (*Id.*) Vice Chairman Place believed there would be negative consequences from ending the practice of certificating DAS network operators that are unsustainable under Pennsylvania and federal law and that would create levels of uncertainty "not conducive to attracting innovative competitive telecommunications carriers to enter and operate within the Commonwealth." (*Id.* at 5-7.)

Now-Commissioner Coleman issued a statement in support of the DAS Order acknowledging that both sides made reasonable arguments on whether DAS network operators are public utilities. (DAS Order, Statement of Commissioner John F. Coleman, Jr. at 1.) However, Commissioner Coleman ultimately agreed with the DAS Order, concluding that DAS network operators provided a mobile and interconnected service and, as such, were furnishing CMRS, a service that was outside the Commission's jurisdiction. (*Id.*) He recognized the concerns of DAS network operators regarding their access to public rights-of-way and utility poles absent a Certificate, but did not agree that this should result in the continued treatment of those operators as public utilities under the Code. (*Id.* at 2.) Rather, Commissioner Coleman believed the existing siting rules for wireless facilities' infrastructure should provide sufficient protection for the DAS network operators to deploy their facilities effectively. (*Id.*)

Crown Castle and ExteNet filed timely petitions for reconsideration, requesting the Commission to review the DAS Order based on alleged errors of law, overlooked arguments, and new facts. The Commission granted the petitions

pending further review and consideration of the merits of the petitions on April 10, 2017. (R.R. at 356a-57a.) After considering their merits, the Commission determined that the petitions did not raise any new arguments in response to the DAS Order, but were seeking another bite at the apple. The Commission disagreed that it overlooked or left unaddressed their prior arguments. Thus, the petitions did not meet the standard for the grant of reconsideration and were denied. Vice Chairman Place dissented, stating that the petitions met the standard for substantive reconsideration and that the DAS Order should be reversed for the reasons set forth in the petitions.

Crown Castle filed a Petition for Review with this Court on June 2, 2017, seeking judicial review of both the DAS Order and the May 4, 2017 Reconsideration Order. Crown Castle filed an Application for Stay or Supersedeas of the Commission's Orders, which this Court granted on August 29, 2017. Following briefing and oral argument, this matter is ready for disposition.[13]

## III. Discussion

### A. *Parties' Arguments*

Crown Castle argues the Commission erred in reversing its decade-long treatment of DAS network providers as public utilities under the Code. It maintains the DAS Order is based on erroneous interpretations of the Code's definition of public utility and is inconsistent with this Court's precedent and other jurisdictions'

---

[13] "[A]ppellate review of an Order of the Commission is limited to[] . . . determining . . . whether[: (1)] a constitutional violation or error in procedure has occurred; (2) the decision is in accordance with the law[;] and (3) the necessary findings of fact are supported by substantial evidence." *PECO Energy Co. v. Pa. Pub. Util. Comm'n*, 791 A.2d 1155, 1160 (Pa. 2002). "With respect to issues of law, our standard of review is de novo and our scope of review is plenary." *Coal. for Affordable Util. Servs. and Energy Efficiency in Pa. v. Pa. Pub. Util. Comm'n*, 120 A.3d 1087, 1095 (Pa. Cmwlth. 2015).

treatment of DAS networks. Crown Castle asserts the Commission erred in interpreting the Code's definition of public utility as excluding it, and other DAS network operators, because they are not providers of CMRS, but of telecommunications services that fall within the Commission's jurisdiction. Crown Castle claims the Commission's extension of the exclusion set forth in subsection (2)(iv) from a person or corporation that "furnishes mobile domestic cellular radio telecommunications service," 66 Pa. C.S. § 102, to a person or corporation that owns or operates equipment that facilitates the furnishing of that service goes beyond the clear statutory language and should not be sanctioned by the Court. In particular, Crown Castle argues, the Commission impermissibly added the phrase "**that operates equipment that facilitates**" the furnishing of CMRS to subsection (2)(iv), *id.* (emphasis added), and misinterpreted multiple federal definitions relating to what constitutes CMRS to justify its position.

Moreover, Crown Castle argues, the Commission's change in its longstanding treatment of DAS network operators, which was consistent with that of public utility commissions in other jurisdictions, is based on the Commission's conflation of the services provided by the DAS network operators' **customers**, *i.e.*, the WSPs, with those provided by the DAS **network**. While the WSPs provide CMRS to their end-user cell phone customers, DAS networks provide only underlying transport services via its fiber optic lines to the WSPs, similar to the transport path services found to be valid public utility services in *Rural Telephone*. That the WSPs "incorporate Crown Castle's transport service as a component part of their provision of mobile service does not convert Crown Castle's RF transport service into a mobile service." (Crown Castle's Brief (Br.) at 38.) Crown Castle observes that this Court, in *Rural Telephone*, rejected similar arguments seeking to conflate the services of one entity

18

with the services provided by that entity's customer, and it should do so again here.[14],[15]

The Commission responds that it did not err in concluding that DAS network operators are not public utilities because its interpretation of the Code is reasonable and is consistent with the *2014 Wireless Infrastructure Order* and federal law. Contrary to Crown Castle's contentions, the Commission maintains, its interpretation of subsection (2)(iv) is consistent with the principles of statutory construction and that, as the agency charged with implementing the Code, its expert interpretation of the Code is entitled to great deference. *Popowsky v. Pa. Pub. Util. Comm'n*, 706 A.2d 1197, 1203 (Pa. 1997). While Crown Castle reads subsection (2)(iv) in a restrictive fashion, focusing solely on the word "furnishes" to argue that the Commission erred, the Commission points out that "owning or operating . . . equipment or facilities" is found in the general definition of public utility set forth in subsection (1)(vi). 66 Pa. C.S. § 102. It contends it properly read the two provisions together to reach a reasonable result. Moreover, the Commission argues,

---

[14] Crown Castle provides additional argument on how: certain necessary findings of fact are not supported by substantial evidence; the Commission disregarded the language "otherwise a public utility" in subsection (2)(iv), 66 Pa. C.S. § 102; the DAS Order adversely affects Crown Castle and other DAS network providers; and the DAS Order violates Section 253 of the Federal Act, 47 U.S.C. § 253. However, because of our disposition, we will not address these additional arguments.

[15] ExteNet has intervened in this matter, and in addition to adopting Crown Castle's brief, argues the Commission erred in its interpretation of subsection (2)(iv) by adding language to that provision resulting in an expansion of that section's scope and meaning. It further argues the Commission did not consider whether DAS network operators furnish CMRS, but focused on the utilization of DAS network facilities that are leased by WSPs to furnish CMRS to the WSPs' customers, which is not how the subsection (2)(iv) exclusion is drafted. That a DAS network operator's customer may be furnishing CMRS using leased DAS network facilities does not, ExteNet contends, convert the DAS network operator into a furnisher of CMRS. ExteNet maintains that DAS networks do not and cannot furnish CMRS but do provide, similar to the telecommunications carrier in *Rural Telephone*, point-to-point telecommunications transport services on a wholesale basis to non-utility CMRS providers.

the General Assembly could not have meant "for an entity to circumvent the exclusion set forth in [subs]ection (2)(iv) by claiming only to 'facilitate' the furnishing of CMRS with its network to third-party CMRS providers instead of furnishing the CMRS outright itself to retail customers." (Commission's (Comm'n) Br. at 22-23.) Because DAS networks are "nothing more than a conduit from a mobile phone user to the CMRS provider's network, thereby extending that mobile wireless network," DAS networks "essentially furnish[] non-jurisdictional mobile domestic cellular radio telecommunications service." (*Id.* at 23.)

Additionally, the Commission maintains its interpretation is consistent with the FCC's rulings that DAS networks, including neutral-host deployments and their facilities, such as the antenna, are personal wireless service facilities. It was on this basis, the Commission asserts, that the FCC extended the siting protections given to wireless facilities to DAS networks in the *2014 Wireless Infrastructure Order*. Moreover, its conclusion that DAS networks provide CMRS is amply supported by the record and by the federal regulations defining CMRS. Here, DAS network facilities accept and transport RF signals from WSPs' retail end-users' mobile devices that will re-connect with the WSP's network, and which will, ultimately, connect with the PSTN. Thus, DAS networks are used to provide a mobile, interconnected service to the public for profit and meet the definition of CMRS.[16]

---

[16] Municipal Stakeholders intervened in support of the DAS Order and argue, *inter alia*, that the Commission's interpretation of the Code is entitled to deference because it is not erroneous, but is consistent with the subsection (2)(iv), the Federal Act, and Federal Regulations defining CMRS, the findings of the FCC, and the weight of the evidence. They maintain that the distinction cited by Crown Castle between companies "that furnish" CMRS and companies "that operate equipment" that furnishes CMRS is one without a difference and that it is not possible to "furnish" CMRS without operating equipment that facilitates furnishing that service. They further argue Crown Castle and other DAS network operators do not provide services to the public at large and, therefore, should not be considered public utilities. Additionally, they challenge Crown

20

In its reply brief, Crown Castle reiterates several of the arguments set forth in its initial brief. It also points out that the Commission recognized in its appellate brief that subsection (2)(iv) is unambiguous[17] and, therefore, Crown Castle asserts, the Commission should have interpreted that subsection in accordance with the language actually used by the General Assembly. Despite this, Crown Castle asserts, the Commission added language to subsection (2)(iv) that focused on the use of equipment owned or operated by DAS network operators, rather than on whether the DAS network operators were themselves furnishing CMRS. Crown Castle claims the Commission's interpretation ignores the actual language the General Assembly used in subsection (2)(iv), conflicts with the General Assembly's intent, and changes the effect of the subsection.

### B. Analysis

With these arguments in mind, we turn to the issues before us – whether the Commission's interpretation of the definition of public utility and the exclusion set forth in subsection (2)(iv) of that definition is consistent with the statutory language, this Court's precedent, the treatment of DAS network operators in other jurisdictions, and federal law. We begin by reviewing the statutory language to determine if it supports the Commission's new interpretation.

---

Castle's assertion that it will suffer adverse consequences from not having its Certificate, pointing to the federal protections for the siting of wireless facilities, which, per the *2014 Wireless Infrastructure Order*, include DAS networks.

[17] Crown Castle quotes the following from the Commission's Brief: "The Petitioners cannot argue that the relevant exclusion set forth in [subs]ection [](2)(iv) of the Code is ambiguous." (Comm'n's Br. at 17.)

### i. The Statutory Language

The touchstone of interpreting statutory language "is to ascertain and effectuate the intention of the General Assembly." Section 1921(a) of the Statutory Construction Act of 1972, 1 Pa. C.S. § 1921(a); *Colville v. Allegheny Cty. Ret. Bd.*, 926 A.2d 424, 431 (Pa. 2007). "Every statute shall be construed, if possible, to give effect to all of its provisions." 1 Pa. C.S. § 1921(a). A guiding principle of statutory construction is that, "[w]hen the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit." 1 Pa. C.S. § 1921(b). It is only when the words of the statute are ambiguous or unclear that courts will apply the principles of statutory construction to determine the intent of the General Assembly. 1 Pa. C.S. § 1921(c); *Zane v. Friends Hosp.*, 836 A.2d 25, 31 (Pa. 2003).

"A statute is ambiguous when there are at least two reasonable interpretations of the text under review." *Warrantech Consumer Prods. Servs., Inc. v. Reliance Ins. Co. in Liquidation*, 96 A.3d 346, 354-55 (Pa. 2014). When a statute is ambiguous, we are guided by certain principles, including that courts "have no authority to add or insert language into a statute" and should not, through interpretation, add a requirement that the General Assembly did not include. *Summit Sch., Inc. v. Dep't of Educ.*, 108 A.3d 192, 199 (Pa. Cmwlth. 2015). However, there are times where "[w]ords and phrases which may be necessary to the proper interpretation of a statute . . . may be added in the construction thereof," but not if the added language would "conflict with [the statute's] obvious purpose and intent" or "in any way affect [the statute's] scope and operation." Section 1923(c) of the Statutory Construction Act of 1972, 1 Pa. C.S. § 1923(c).

22

As in all statutory construction matters, we begin with the relevant statutory language. Section 102 of the Code defines public utility as:

(1) **Any person or corporations now or hereafter owning or operating** in this Commonwealth **equipment or facilities for**:

***

(vi) **Conveying or transmitting messages or communications**, except as set forth in paragraph (2)(iv), by telephone or telegraph or domestic public land mobile radio service including, but not limited to, point-to-point microwave radio service for the public for compensation.

66 Pa. C.S. § 102 (emphasis added). The Commission found that DAS network operators fall within the general definition of public utility because they operate "facilities that convey or transmit messages or communications." (DAS Order at 14.) However, in subsection (2)(iv), the General Assembly specifically excluded from this definition "**[a]ny person or corporation**, not otherwise a public utility, **who or which furnishes mobile domestic cellular radio telecommunications service**," in other words, furnishes CMRS. 66 Pa. C.S. § 102 (emphasis added).

Here, the Commission construed the Code's statutory language as excluding from its "jurisdiction any person that operates equipment that 'furnishes mobile domestic cellular radio telecommunications service'" and found that DAS network operators operate such equipment. (DAS Order at 18 (quoting subsection (2)(iv)).) The Commission argues this interpretation is entitled to substantial deference because of the highly technical nature of the Code and the Commission's role in implementing the Code. While this level of deferential review is generally applicable to Commission interpretations of the Code, *Dauphin County Industrial Development Authority v. Pennsylvania Public Utility Commission*, 123 A.3d 1124, 1133 (Pa. Cmwlth. 2015), the Commission's interpretation in the DAS Order

23

deviates from its historical interpretation and application of the Code to DAS network operators and, as such, is not entitled to much deference.

"An administrative agency may revise and correct its prior interpretation of a statute"; but "**it cannot expect that its later interpretation is entitled to very much deference**." *Id.* at 1135 (emphasis added); *see also Mazza v. Sec'y of Dep't of Health and Human Servs.*, 903 F.2d 953, 958 (3d Cir. 1990) (an agency's interpretation of its statute is entitled to little deference when it is at odds with a prior interpretation). There has been no change in the Code since the Commission began granting Certificates to DAS network operators in 2005. Yet, in 2017, the Commission reversed course and decided, notwithstanding this longstanding practice, that it no longer had jurisdiction because DAS network operators were not public utilities. Given the very recent change in its interpretation of the Code, the Commission's interpretation set forth in the DAS Order is not entitled to much deference. *Dauphin Cty. Indus. Dev. Auth.*, 123 A.3d at 1135; *Mazza*, 903 F.2d at 958.

By its express terms, subsection (2)(iv) excludes from the definition of public utility only a "**person or corporation**, not otherwise a public utility, **who or which furnishes** mobile domestic cellular radio telecommunications service," *i.e.*, CMRS. 66 Pa. C.S. § 102 (emphasis added). Unlike the general definition of public utility in subsection (1), subsection (2)(iv) **does not include** the phrase "owning or operating . . . equipment or facilities." *Id.* Nevertheless, in reaching its conclusion excluding DAS network operators from the definition of public utility, the Commission **added** that language to subsection (2)(iv), thereby expanding the scope of the statutory exclusion. Under the Commission's interpretation, the exclusion now includes not only a person or company that "furnishes" CMRS, but also any

24

person or company who owns or operates equipment that is used, pursuant to a service agreement, in furnishing CMRS, even if that person or company does not, itself, furnish CMRS. However, **words and phrases may not be added** to a statute **if the addition will "in any way affect its scope and operation**." 1 Pa. C.S. § 1923(c) (emphasis added). The addition of language is not warranted where the existing statutory text makes sense as it is written and the implied reading of words into that text "change[s] the existing meaning or effect of the actual statutory language." *Pa. Sch. Bds. Ass'n, Inc. v. Pub. Sch. Emps. Ret. Bd.*, 863 A.2d 432, 439 (Pa. 2004). The existing statutory text of subsection (2)(iv), as written, makes sense, and the Commission's implied reading of "that operates equipment" into that text "change[s] the existing meaning or effect of the actual statutory language" by expanding its application to entities that do not fall within the plain language of the statutory exclusion. *Id.*

The Commission maintains that its construction of subsection (2)(iv) is necessary to prevent entities from circumventing the exclusion, a result that the General Assembly must not have intended. However, "where the legislature includes specific language in one section and excludes it from another section, the language may not be implied where excluded" and "the omission of such a provision from a similar section is significant to show a different legislative intent." *Commonwealth v. Mazzetti*, 44 A.3d 58, 67 (Pa. 2012); *see also Popowsky*, 706 A.2d at 1203 (stating "when the legislature includes specific language in one section of a statute and excludes it from another, it should not be implied where excluded") (internal quotation omitted). In drafting the exclusion, the General Assembly chose not to include the broader owner/operator of equipment/facilities language found in subsection (1) in subsection (2)(iv). The omission of this language in subsection

(2)(iv) must be given effect in ascertaining the General Assembly's intent, which the Commission's more expansive interpretation does not do. For these reasons, the Commission's new interpretation of subsection (2)(iv) set forth in the DAS Order is not supported by the statutory language.

ii.    <u>This Court's Precedent and the Determinations of Other Jurisdictions</u>

Although we conclude the Commission's new interpretation is not supported by the statutory language, our inquiry is not over because we must also consider whether DAS network operators' services include actually furnishing CMRS. Crown Castle asserts that the Commission's conclusion that DAS network operators furnish CMRS is erroneous because its network cannot furnish (supply or provide) CMRS where it: has no control over the generation of the radio transmissions that are transported via its network; has no license for spectrum to facilitate the radio communication between the Node and the end-user's cell phone – the WSP owns that spectrum; and has no customer relationship with that end-user – who is the WSP's customer. Rather, Crown Castle asserts, it provides transport path service for its WSP customers' wireless communications and such service is a certificated telecommunications service. *Rural Telephone*, 941 A.2d at 758-59. The DAS Order's conflation of the **transport services** DAS network operators provide to their WSP customers with the CMRS **the WSP provides** to its retail end-user cell phone customer, Crown Castle argues, is contrary to this Court's decision in *Rural Telephone* and inconsistent with the determinations of other jurisdictions.

There is no dispute that the WSPs have contracts with their retail cell phone customers whereby the WSPs provide phone numbers and CMRS to those customers or that it is the WSPs that own the spectrum over which those customers' radio

26

signals are transmitted. In contrast, to provide the services offered by DAS network operators, those operators own no spectrum, need no phone numbers, and their contractual relationship is solely with the WSP, not with the retail cell phone user. Furthermore, while the Commission indicated that the DAS network "transmits (or receives) the radio signals to (and from) the wireless end-user customer," (DAS Order at 17), the DAS network operator has no control over the generation of that signal. Until such radio signals are generated by the WSP and its end-user, there is nothing for the DAS network to do. Under these circumstances, it does not appear the DAS network operator can, itself, furnish CMRS. However, in concluding that DAS network operators were not public utilities under subsection (2)(iv), the Commission focused not on whether the DAS networks could **actually furnish** CMRS, but on the fact that DAS networks were used **by the WSP** to furnish **the WSP's CMRS**. In doing so, the Commission conflated the CMRS of the DAS network operators' customers with the transport path services of the DAS network operator. Such conflation, as Crown Castle argues, is contrary to this Court's decision in *Rural Telephone*.

In *Rural Telephone*, Core Communications (Core) sought approval to provide additional connectivity services to internet service providers (ISPs) in new service territories. 941 A.2d at 753. ISPs, among others, contracted with Core for the provision of transmission path services for their internet services. The ISPs were Core's only customers, and Core offered no services directly to the general public. Similar to the arguments that DAS network operators furnish CMRS, the objectors in *Rural Telephone* argued that Core was a wholesale ISP and granting it a Certificate would give it a competitive advantage over other ISPs. *Id.* at 756, 763. However, this Court held that Core's "transmission path service [was] a

27

telecommunication service under the Code," and that while the "internet service [was] an information service" that did not fall within the Commission's jurisdiction, "the transmission path needed to provide that internet service is a telecommunication service" under state and federal law. *Id.* at 758. Further, consistent with the purpose of encouraging competition, we concluded that Core now had "the ability to provide an alternative transmission path service" allowing its ISP customers to compete with other ISPs in that area. *Id.* at 759. Finally, we noted that, although Core provided services to a limited class of customers, the ISPs, rather than the general public, it still provided a public utility service "for the public."[18] *Id.* at 760.

In the DAS Order, the Commission concluded that the **transport services** provided by DAS network operators were the equivalent of the CMRS provided by the WSPs to their customers. However, pursuant to *Rural Telephone*, DAS network operators' transport service, which conveys or transmits messages or communications to the public for compensation, is a telecommunications service under the Code notwithstanding the fact that the WSPs use it to transmit a service not regulated by the Commission, here CMRS. *Id.* at 758-59. Consistent with *Rural Telephone*, Chairman Brown persuasively explained in her Dissenting Statement that "DAS is a form of wholesale common carrier telecommunications **transport service regardless of the services provided over that connection** or the technology or combinations of technologies used to" provide that transport service. (Dissenting Statement of Chairman Brown at 1 (emphasis added).) Thus, like Core in *Rural Telephone*, Crown Castle and other neutral-host DAS network operators offer contractual transport services to their WSP customers that should not, as the

---

[18] Thus, the fact that Crown Castle and other neutral-host DAS network operators provide services to WSPs, rather than the general public, does not preclude their status as a public utility. *Rural Telephone*, 941 A.2d at 760.

Commission did in the DAS Order, be equated to the CMRS offered by the WSP, over which the Commission has no jurisdiction. Yet, the DAS Order does not distinguish between the transport path service, which relies on fixed wireless technology and is otherwise within the Commission's jurisdiction, from the CMRS transported along that path, which the WSPs sell to their customers and is not regulated by the Commission under Section 102 of the Code. As such, the Commission's conclusion that DAS network operators actually furnish CMRS on this basis is inconsistent with *Rural Telephone*.

This reasoning is consistent with that in other jurisdictions, which have recognized that the transport services offered by DAS networks are telecommunications services that are properly certificated as public utilities. For example, the Texas Public Utility Commission (Texas Commission) considered, in 2017, whether ExteNet's DAS network system, which provided transport services for CMRS providers, constituted a wireless service. *Compl. of ExteNet Network Sys., Inc., against the City of Houston for Imposition of Fees for Use of Pub. Right of Way*, PUC Docket No. 45280, SOAH Docket No. 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, 2017 WL 2079683, at *4 (Tex. P.U.C. 2017). After holding a formal evidentiary hearing, the Texas Commission determined, based on a similar technical description of the DAS networks here, that ExteNet was providing a telecommunications service, not a CMRS service. *Id.* at *2. The Texas Commission concluded ExteNet did not provide a wireless or mobile service because, *inter alia*, it: lacked the right to use specific radio spectrum under a FCC license; had no spectrum allocated to its telecommunication services; could not independently provide a radio communication service; does not send or "receive[] any radio communications until activated by ExteNet's CMRS retail customer"; and did not offer CMRS to end-user

29

customers. *Id.* at *4-5. Similar to ExteNet's DAS network in Texas, the DAS networks Crown Castle and other neutral-host DAS network operators own have no spectrum, need no phone numbers to operate, cannot independently provide a radio communication service, and are activated only by the CMRS retail customer.

In California, the California Public Utilities Commission (California Commission) granted NextG Networks of California, Inc. (NextG), a certificate of public convenience "to provide [RF] transport services" by placing "microcells and antennas on existing utility poles" to "augment [wireless] carriers' geographic wireless coverage and improve system capacity." *City and Cty. of San Francisco v. NextG Networks of Cal., Inc.*, Nos. 05-03-010, 06-01-006, 2006 WL 151886, at *1 (Cal. P.U.C. 2006), slip op. at 1 (referencing a prior California Commission order granting that authority to NextG). Denying a challenge to NextG's attempts to attach its network components in public rights-of-way, the California Commission confirmed that NextG had the authority, via its certificate, to provide RF transport services via its network as a telecommunications service. *Id.* at *3-4, slip op. at 3-6. In doing so, the California Commission observed that its decision was consistent with its treatment of services similar to NextG's RF transport services, such as a DAS network service operated by Crown Castle Solutions Corporation and the installation of microwave antennas. *Id.* at *3, slip op. at 6. Like NextG in California, Crown Castle and other neutral-host DAS network operators in Pennsylvania are providing RF transport services via their networks as a telecommunications service.

We also note that this Court, in *Rural Telephone*, recognized the importance of encouraging competition through the availability of alternative transmission path services. Because Crown Castle and the DAS networks at issue here are neutral-host networks, they provide an alternative transmission path service that transports

30

calls from the customers of multiple WSPs. Their expansion can encourage competition by allowing multiple WSPs to utilize those networks to expand and improve the WSPs' coverage in a particular area. Holding, as the Commission does in the DAS Order, that these DAS networks are not public utilities could hinder the development of "the next generation of wholesale transport service needed to offload astronomical increases in the demand for the broadband needed to carry voice calls and access the internet," as well as to offload "traffic onto fiber networks that, in turn, indirectly connect to the PS[T]N" that can include wireline and 911 calls. (Dissenting Statement of Chairman Brown at 2.) Accordingly, the Commission's change in its treatment of DAS network operators also is inconsistent with *Rural Telephone*'s recognition that competition is encouraged through the certification of providers of wholesale transport services, even if the services being transported do not, themselves, fall within the jurisdiction of the Commission.

For these reasons, it cannot be said that DAS network operators' services include **actually** furnishing CMRS. This Court, in *Rural Telephone*, recognized that the Code treats transmission services as telecommunications services that fall within the Commission's jurisdiction even if they transmit non-jurisdictional services, and at least two other jurisdictions have found that the provision of RF transport services via a DAS network is a telecommunications service entitled to a certificate of public convenience. While the Commission's prior interpretation of the Code was consistent with these decisions, its new interpretation set forth in the DAS Order is not.

iii. The FCC's *2014 Wireless Infrastructure Order*

31

Finally, we turn to the Commission's contention that its new interpretation treating DAS network operators as furnishing CMRS is supported by the FCC's *2014 Wireless Infrastructure Order*. In the *2014 Wireless Infrastructure Order*, the FCC explained that certain siting protections set forth in the Federal Act and the FCC's rulings for wireless facilities would apply to DAS facilities, including neutral-host DAS deployments, "to the extent [those facilities] are or will be used for the provision of personal wireless services." *2014 Wireless Infrastructure Order* at 12973. Notably, Section 332(c)(7)(C) of the Federal Act separately defines "personal wireless services" and "personal wireless service facilities" as:

> (i) the term "personal wireless services" means commercial mobile services, unlicensed wireless services, and common carrier wireless exchange access services;

> (ii) the term "personal wireless service facilities" means facilities for the provision of personal wireless services; . . . .

47 U.S.C. § 332(c)(7)(C). Thus, the Federal Act distinguishes between "personal wireless services," which includes CMRS, and the facilities that are used to provide "personal wireless services." *Id.* It does not equate the two as both being "personal wireless services." Accordingly, when the FCC extended the siting protections for wireless **facilities** to neutral-host DAS network **facilities** when they are used to provide personal wireless services, it did not find, as the Commission held in the DAS Order, that the DAS networks, themselves, were providers of personal wireless services.

Moreover, the question before the FCC in the *2014 Wireless Infrastructure Order* was not whether the DAS network operators were providing CMRS, but whether expanding the siting protections to those networks, whose **facilities are used to provide wireless service**, was consistent with the Federal Act, regulations,

32

and the FCC's rulings. This is different from the question before the Commission, which was whether Crown Castle, and other neutral-host DAS network operators, should continue to receive Certificates as providers of telecommunications transport services or whether DAS network operators are "furnishing" CMRS and excluded from the definition of public utility. Unlike Section 332(c)(7)(C) of the Federal Act, which separately addresses "personal wireless services" and "personal wireless service facilities," the exclusion set forth in subsection (2)(iv) applies only to those persons or companies that furnish the CMRS itself and does not, by its terms, address those that operate facilities that are used to provide CMRS that do not, themselves, furnish CMRS. Therefore, we are not persuaded by the Commission's reliance on the *2014 Wireless Infrastructure Order* to support its new interpretation of subsection (2)(iv).

## IV. Conclusion

For 10 years, the Commission granted Certificates to DAS network operators as public utilities, which allowed for the continued development and expansion of small cell technology to provide transmission services to support the increasing demand for wireless communications services throughout the Commonwealth. The Commission's 2017 change in its interpretation was prompted by jurisdictional concerns related to whether those operators were, in actuality, furnishing CMRS regulated by the FCC. However, for the reasons discussed above, the Commission's new interpretation of the Code to exclude DAS network operators from the definition of public utility under subsection (2)(iv) because they furnish CMRS is not supported by the plain language of the Code or the principles of statutory construction, the precedent of this Court, the determinations of public utility

33

commissions in other jurisdictions, or the *2014 Wireless Infrastructure Order*. Accordingly, the Commission's Orders are reversed.

_____
**RENÉE COHN JUBELIRER,** Judge

Judge Brobson did not participate in the decision in this case.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Crown Castle NG East LLC and     :
Pennsylvania-CLE LLC,          :
                  Petitioners   :
                               :
            v.             :    No. 697 C.D. 2017
                               :
Pennsylvania Public Utility      :
Commission,                  :
                  Respondent   :

## O R D E R

**NOW**, June 7, 2018, the March 17, 2017 and May 4, 2017 Orders of the Pennsylvania Public Utility Commission, entered in the above-captioned matter, are **REVERSED**.

 

_____
**RENÉE COHN JUBELIRER,** Judge