**[J-81-2019]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| CROWN CASTLE NG EAST LLC AND PENNSYLVANIA-CLE LLC, | : | No. 2 MAP 2019 |
| | : | |
| | : | Appeal from the Order of the |
| Appellees | : | Commonwealth Court dated June 7, |
| | : | 2018 at No. 697 CD 2017 Reversing |
| | : | the Order of the Pennsylvania Public |
| v. | : | Utility Commission dated May 4, 2017 |
| | : | at No. M-2016-2517831. |
| | : | |
| PENNSYLVANIA PUBLIC UTILITY | : | ARGUED:  October 15, 2019 |
| COMMISSION, | : | |
| | : | |
| Appellant | : | |

**OPINION**

**JUSTICE MUNDY**                                          **DECIDED:  July 21, 2020**

In this appeal by allowance, we consider the level of deference courts must afford an administrative agency's interpretation of its enabling statute.  We conclude that an agency's interpretation of a clear and unambiguous statute is not entitled to deference. Additionally, we consider whether the Commonwealth Court erred in concluding that Distributed Antenna System (DAS) networks are public utilities under the Pennsylvania Public Utility Code (Code),[1] thereby reversing the Pennsylvania Public Utility Commission's (PUC) interpretation of the definition of "public utility."  For the following reasons, we affirm the judgment of the Commonwealth Court.

---

[1] 66 Pa.C.S. §§ 101-3316.

This case involves the status of DAS networks as public utilities in Pennsylvania. Appellees, Crown Castle NG East LLC (Crown Castle NG) and Pennsylvania-CLEC LLC (Pennsylvania-CLEC) (collectively Crown Castle), operate DAS networks. Crown Castle's DAS networks provide telecommunications transport services to Wireless Service Providers (WSP), such as AT&T Wireless, Verizon Wireless, T-Mobile, and others. The WSPs offer "commercial mobile radio service" (CMRS) to retail end-users.[2]

---

[2] CMRS is a term of art in connection with the Federal Communications Act, 47 U.S.C. §§ 151-624. The Federal Communications Commission regulations define CMRS as:

> A mobile service that is: (a)(1) provided for profit, i.e., with the intent of receiving compensation or monetary gain;
>
> (2) An interconnected service; and
>
> (3) Available to the public, or to such classes of eligible users as to be effectively available to a substantial portion of the public; or
>
> (b) The functional equivalent of such a mobile service described in paragraph (a) of this definition.
>
> (c) A variety of factors may be evaluated to make a determination whether the mobile service in question is the functional equivalent of a commercial mobile radio service, including: Consumer demand for the service to determine whether the service is closely substitutable for a commercial mobile radio service; whether changes in price for the service under examination, or for the comparable commercial mobile radio service, would prompt customers to change from one service to the other; and market research information identifying the targeted market for the service under review.
>
> (d) Unlicensed radio frequency devices under part 15 of this chapter are excluded from this definition of Commercial mobile radio service.

47 C.F.R. § 20.3. Although the term CMRS is not used in the Code, the PUC considers CMRS as synonymous with the Code's term "mobile domestic cellular radio telecommunications service." PUC Order, *Review of Issues Relating to Comm'n Certification of Distributed Antennae Sys. Providers in Pa.*, M-2016-2517831, 2/23/16, at 3 n.4.

A DAS network transports the wireless traffic of its WSP customers, consisting of voice, data, and video traffic generated by a consumer's mobile device (smartphone), over terrestrial fiber optic lines between "nodes" and "hubs." The nodes are located on utility, streetlight, or traffic poles in public rights-of-way. They are comprised of small, low power antennae that receive radio frequency (RF) signals and additional equipment that converts the RF signals to optical signals. The optical signals are then transported over the DAS provider's fiber optic lines to a WSP's central hub, which is typically housed in a building on private property, where the signals are returned to the WSP customers. Crown Castle's DAS networks also transport signals for its WSP customers in the reverse direction, from a hub to a node.[3]

DAS networks increase the coverage area of their WSP customers' networks. Due to the small size of the DAS node equipment, it can be installed on existing structures in areas that traditional cell towers cannot be located, such as densely populated urban areas or stadiums. This provides augmented network coverage to WSPs' retail end-users with minimal visual or physical impact, unlike cell towers. A WSP provider may operate

---

[3] The Federal Communications Commission has similarly explained:

> A DAS network consists of three primary components: (i) a number of remote communications nodes (DAS node(s)), each including at least one antenna for the transmission and reception of a wireless service provider's RF signals; (ii) a high capacity signal transport medium (typically fiber optic cable) connecting each DAS node back to a central communications hub site; and (iii) radio transceivers or other head-end equipment located at the hub site that propagates and/or converts, processes or controls the communications signals transmitted and received through the DAS nodes.

*In re Implementation of Section 6002(b) of the Omnibus Budget Reconciliation Act of 1993*, 32 FCC Rcd. 8968, 8997 n.133 (FCC 2017).

its own DAS networks that serve only its customers, or it may lease a DAS network from a neutral host, such as Crown Castle.

From 2005 to 2015, the PUC granted certificates of public convenience (CPC) to at least five neutral host DAS network operators, including Crown Castle NG and Pennsylvania-CLEC, to operate as Competitive Access Providers (CAP), concluding they were "public utilities" under Section 102 of the Code, which provides:

> **"Public utility."**
>
> > (1) Any person or corporations now or hereafter owning or operating in this Commonwealth equipment or facilities for:
> >
> > . . .
> >
> > (vi) Conveying or transmitting messages or communications, except as set forth in paragraph (2)(iv), by telephone or telegraph or domestic public land mobile radio service including, but not limited to, point-to-point microwave radio service for the public for compensation.
> >
> > . . .
>
> > (2) The term does not include:
> >
> > . . .
> >
> > (iv) Any person or corporation, not otherwise a public utility, who or which furnishes mobile domestic cellular radio telecommunications service.
> >
> > . . .

66 Pa.C.S. § 102; *see also Crown Castle NG E. LLC v. Pa. Pub. Util. Comm'n*, 188 A.3d 617, 620 (Pa. Cmwlth. 2018). Obtaining a CPC provides DAS networks with facilities

siting benefits in that they gain access to public rights-of-way, are exempted from local zoning rules, and can exercise the power of eminent domain. PUC Order, *Review of Issues Relating to Comm'n Certification of Distributed Antennae Sys. Providers in Pa.*, M-2016-2517831, 3/17/17, at 23, 30 [hereinafter DAS Order]; *see also* 66 Pa.C.S. § 1104 (noting that a public utility cannot exercise the power of eminent domain until it receives a CPC).

On November 19, 2015, the PUC granted a CPC to the neutral host DAS network operator SQF, LLC (SQF). However, two commissioners voted against issuing a CPC to SQF and filed statements explaining they concluded the PUC did not have jurisdiction to regulate or issue CPCs to DAS networks because they did not meet the Code's definition of public utilities. *See* 66 Pa.C.S. § 501 (providing PUC has jurisdiction to supervise and regulate all public utilities in Pennsylvania). Thus, even though the PUC issued a CPC to SQF, it also directed the opening of formal proceedings to investigate the issue of the PUC's jurisdiction over DAS network operators.

On February 23, 2016, the PUC entered an order initiating a formal investigatory proceeding to determine whether it should continue to certify DAS networks as public utilities pursuant to Section 102(1)(vi) or whether DAS networks were "mobile domestic cellular radio telecommunications service[s]," which Section 102(2)(iv) excludes from the definition of public utility. *Compare* 66 Pa.C.S. § 102(1)(vi) *with* § 102(2)(iv). To guide its inquiry, the PUC issued 12 questions in an appendix to its investigation order and solicited comments and reply comments from interested parties. The PUC received comments from numerous stakeholders in three broad groups: Industry Stakeholders,[4]

---

[4] The Industry Stakeholders included DAS network providers (Crown Castle NG, Pennsylvania-CLEC, and ExteNet Systems, Inc. (ExteNet)), owners of telecommunications facilities, the Wireless Association (CTIA), and the Wireless Infrastructure Association (PCIA).

Municipal Stakeholders,[5] and the Office of Consumer Advocate.

Without holding a formal hearing, the PUC issued its March 17, 2017 DAS Order, which found that DAS networks were not entitled to certification as public utilities, but instead were excluded from the definition of public utilities under Section 102(2)(iv) because they "furnish[ed] mobile domestic cellular radio telecommunications service." *See* 66 Pa.C.S. § 102(2)(iv). The PUC began its analysis of Section 102 by stating that DAS network providers met the definition of public utility in Section 102(1)(vi) because they operate facilities that convey or transmit messages or communications. DAS Order at 14. However, the PUC then concluded that DAS networks were excluded from the definition of public utility by Section 102(2)(iv) because they "furnish mobile domestic cellular radio telecommunications service." *Id.* at 23 (quoting 66 Pa.C.S. § 102(2)(iv)).

The PUC arrived at this conclusion by analyzing the technology DAS networks employ. The PUC explained that DAS networks provide personal wireless service by sending and receiving RF signals from the antenna at the node. *Id.* at 15-17 (relying on *In re Acceleration of Broadband Deployment by Improving Wireless Facilities Siting Policies*, 29 FCC Rcd. 12865, 12973 at ¶ 270 (FCC 2014) [hereinafter *2014 Wireless Infrastructure Order*] (stating "to the extent DAS . . . are or will be used for the provision of personal wireless services, their siting applications are subject to the same presumptively reasonable timeframes that apply to applications related to other personal wireless service facilities.")). Because DAS networks' antennae send and receive RF signals, the PUC rejected the DAS providers' contention that they provide "backhaul

---

[5] The Municipal Stakeholders represented nearly all of Pennsylvania's 2,600 municipalities and included the Pennsylvania Municipal League (PML), the Pennsylvania State Association of Township Supervisors (PSATS), the Pennsylvania State Association of Boroughs (PSAB), the Pennsylvania State Association of Township Commissioners (PSATC), and multiple individual municipalities.

service."[6]  *Id.* at 16-17.  Similarly, the PUC dismissed the claim that the WSPs generate the RF signal, as the PUC found the DAS providers also wirelessly send and receive that RF signal.  *Id.* at 17.  Defining the term "furnish" in Section 102(2)(iv) as "to provide" or "to supply," the PUC concluded that DAS networks furnish, provide, and supply personal wireless services.  *Id.* at 18, 18 n.46 (using Macmillan Dictionary, Merriam-Webster Dictionary, Oxford English Dictionary, and Black's Law Dictionary to define "furnish").

The PUC next found that DAS facilities are used to furnish "mobile" wireless services.  Applying the Federal Communications Commission's rules and definitions, the PUC focused on whether the end-user's equipment is mobile or fixed.  *Id.* at 21.  The PUC found the wireless communication that DAS networks transmit is to mobile devices including smartphones and tablets.  *Id.* at 22.  The PUC rejected the DAS providers' contention that their service is not mobile because they transport signals between fixed nodes and stationary hubs.  *Id.*  The PUC explained that the large dishes on macro towers are similarly stationary but are considered part of a mobile service.  Accordingly, the PUC concluded "DAS facilities furnish mobile domestic cellular radio telecommunications service and, hence, cannot be certificated as public utilities under the Code."  *Id.* at 23.

---

[6] The FCC has explained "backhaul services" as follows:

> Another component [of wireless infrastructure facilities] is the backhaul connections that link a mobile wireless service provider's cell sites to the mobile switching centers that provide connections to the provider's core network, the public switched telephone network, or the Internet, carrying wireless voice and data traffic for routing and onward transmission. Backhaul facilities are generally provided by incumbent local exchange carriers (ILECs), competitive local exchange carriers (CLECs), competitive fiber and microwave wholesalers, cable providers, and independent backhaul operators.

*In re Comm'ns Marketplace Report*, FCC 18-181, 2018 WL 6839365, at *16 n.108 (FCC 2018).

The PUC considered its decision's interaction with federal law. *Id.* The PUC dismissed concerns that decertification was a barrier to entry in violation of federal law. *Id.* Further, the PUC noted that federal law cannot compel it to certify a public utility based on potential siting complications arising from local ordinances. *Id.* at 23-24. The PUC conceded that federal law precludes the PUC from requiring DAS network operators to obtain a CPC. *Id.* at 24.

Next, the PUC addressed the implications of its decision to no longer certify DAS networks as public utilities related to facilities' siting. *Id.* The PUC dismissed the DAS providers' concern that they would have difficulties obtaining pole attachments without CPCs because the DAS Order recognized DAS operators provide telecommunications service, and the FCC granted pole attachment rights to all telecommunications providers. *Id.* at 25. Moreover, the PUC stated "it is illegal for any utility to require a CPC from this Commission as a requirement for allowing a telecommunication[s] service provider to exercise its pole occupancy rights." *Id.* at 27. Likewise, the PUC dismissed the DAS providers' contention that its ruling would affect DAS providers' ability to access public rights-of-way by noting that such access is protected under federal and state law. *Id.* at 28 (citing 47 U.S.C. § 253(a), (c); FCC's 2009 *Shot Clock Ruling*, 24 FCC Rcd. 13994; FCC's 2014 *Wireless Infrastructure Order*; Pennsylvania Wireless Broadband Collocation Act of 2012 (Act 191)). Finally, the PUC acknowledged that its decision would preclude DAS operators from exercising the power of eminent domain and from overriding local zoning rules. *Id.* at 32. It defended that outcome as appropriate because the General Assembly did not provide those rights to DAS providers in Act 191, which gave the courts of common pleas oversight of zoning disputes and did not provide the PUC the ability to issue CPCs to override that oversight. *Id.* (citing 53 P.S. § 11702.5(a)).

Crown Castle and ExteNet filed timely petitions for reconsideration, which the PUC denied on May 4, 2017. Crown Castle filed a petition for review in the Commonwealth Court, which the court granted.

A unanimous, en banc Commonwealth Court[7] reversed the PUC's DAS Order. *Crown Castle*, 188 A.3d at 637. The Commonwealth Court engaged in statutory construction of Section 102, stating it would apply the plain language of the statute unless it was ambiguous. *Id.* at 630-31. Addressing the PUC's argument that its interpretation of Section 102 was entitled to "substantial deference," the court explained that the DAS Order represented a change in the PUC's interpretation of Section 102 and, accordingly, the court would not give it much deference. *Id.* at 631. In support, the Commonwealth Court quoted its prior decision in *Dauphin County Industrial Development Authority v. Pennsylvania Public Utility Commission*, 123 A.3d 1124 (Pa. Cmwlth. 2015), stating, "'[a]n administrative agency may revise and correct its prior interpretation of a statute; but 'it cannot expect that its later interpretation is entitled to very much deference.'" *Id.* (quoting *Dauphin County*, 123 A.3d at 1135) (emphasis omitted)). The court also relied on *Mazza v. Secretary of Department of Health & Human Services*, 903 F.2d 953 (3d Cir. 1990), which likewise explained that an agency's altered interpretation of a statute is given little deference. *Id.* (citing *Mazza*, 903 F.2d at 958). After noting that the legislature had not changed Section 102 of the Code since 2005 when the PUC began granting CPCs to DAS operators, the Commonwealth Court found "the [PUC's] interpretation set forth in the DAS Order is not entitled to much deference." *Id.* at 632.

Construing the language of Section 102, the Commonwealth Court noted that the PUC found that DAS networks meet the general definition of public utility in Section 102(1)(vi); thus, the court focused on the PUC's conclusion that DAS networks are

---

[7] Judge Brobson did not participate in the decision.

excluded from this definition by Section 102(2)(iv). *Id.* at 631-32. The court reasoned that the PUC erred by adding the Section 102(1)(vi) phrase "owning or operating . . . equipment or facilities" to Section 102(2)(iv), which effectively expanded the scope of the exclusion. *Id.* at 632. "Under the [PUC's] interpretation, the exclusion now includes not only a person or company that 'furnishes' CMRS, but also a person or company who owns or operates equipment that is used, pursuant to a service agreement, in furnishing CMRS, even if that person or company does not, itself, furnish CMRS." *Id.* The court explained that adding words or phrases to a statute in a way that changes its scope and operation is prohibited. *Id.* (citing 1 Pa.C.S. § 1923(c); *Pa. Sch. Bds. Ass'n, Inc. v. Pub. Sch. Employees. Ret. Bd.*, 863 A.2d 432, 439 (Pa. 2004)). Further, the court concluded the PUC's interpretation did not give effect to the legislature's omission of the "owner/operator of equipment/facilities" language from Section 102(2)(iv). *Id.* Therefore, the Commonwealth Court held the PUC's interpretation of the Section 102(2)(iv) exclusion was not consistent with the statute's plain language. *Id.*

After concluding the PUC erred in its interpretation of Section 102(2)(iv), the Commonwealth Court analyzed whether DAS networks actually "furnish" CMRS and concluded they did not. *Id.* at 633. In contrast to the WSPs, the court explained the DAS network operators do not own a wireless spectrum, do not issue or use phone numbers, and do not have a contract with the retail end-user. *Id.* Additionally, the DAS operators transport a wireless signal only after the WSPs and their end-users generate it. *Id.* Due to these discrepancies, the Commonwealth Court found that DAS networks were incapable of furnishing CMRS. *Id.* Further, the court reasoned that the PUC's error was focusing on the fact that WSPs use DAS networks to furnish the WSPs' CMRS instead of analyzing whether DAS networks have the capacity to furnish CMRS. *Id.* According to

the Commonwealth Court, this conflated the WSPs' provision of CMRS with the DAS network operators' transmittal services.

The Commonwealth Court analogized this case to *Rural Telephone Co. Coalition v. Public Utility Commission*, 941 A.2d 751 (Pa. Cmwlth. 2008), in which it held that the transmission path that Core Communications provided to internet service providers (ISP) was a telecommunications service, even though the PUC did not have jurisdiction over the ISP service. *Crown Castle*, 188 A.3d at 633 (citing *Rural Tel.*, 941 A.2d at 758). The analysis in *Rural Telephone* led the Commonwealth Court to conclude that the DAS networks' transportation service is a jurisdictional telecommunications service even though the WSPs use DAS networks to provide CMRS, which is not regulated by the PUC. *Id.* at 634. "Thus, like Core in *Rural Telephone*, Crown Castle and other neutral-host DAS network operators offer contractual transport services to their WSP customers that should not, as the Commission did in the DAS Order, be equated to the CMRS offered by the WSP, over which the Commission has no jurisdiction." *Id.*

Moreover, the Commonwealth Court noted its conclusion that DAS networks do not furnish CMRS was consistent with the decisions of the Texas Public Utility Commission and the California Public Utility Commission. *Id.* at 634-35 (discussing *Complaint of ExteNet Network Sys., Inc., against the City of Houston for Imposition of Fees for Use of Pub. Right of Way*, 2017 WL 2079683, at *4-5 (Tex. P.U.C. 2017) (concluding a DAS network provided a telecommunications service, not a CMRS service); *City & County of S.F. v. NextG Networks of Cal., Inc.*, 2006 WL 151886, at *3-4 (Cal. P.U.C. 2006) (finding a DAS network provider had the right to place its components in public rights-of-way and to provide RF transport services as a telecommunications service)). Accordingly, the Commonwealth Court concluded that the PUC's finding that DAS network operators actually furnish CMRS was inconsistent with *Rural Telephone*'s

treatment of transportation services and with other jurisdictions' classification of DAS networks. *Id.*

Finally, the Commonwealth Court found the FCC's *2014 Wireless Infrastructure Order* does not support the PUC's treatment of DAS networks as furnishing CMRS. *Id.* at 636. The court explained that the FCC's ruling was that siting protections for wireless facilities would apply to DAS facilities to the extent they supply "personal wireless services." *Id.* The court noted the federal act distinguishes "personal wireless services" from "personal wireless service facilities." *Id.* (quoting 47 U.S.C. § 332(c)(7)(C) (defining "personal wireless services" as including CMRS and defining "personal wireless service facilities" as "facilities for the provision of personal wireless services")). The court found this distinction undercut the PUC's holding that DAS networks provide personal wireless service. *Id.* Further, the court distinguished the *2014 Wireless Infrastructure Order* because it addressed extending siting protections to DAS networks; it did not address whether DAS networks provide CMRS, which was the question before the PUC. *Id.* The court reasoned, "[u]nlike Section 332(c)(7)(C) of the Federal Act, which separately addresses 'personal wireless services' and 'personal wireless service facilities,' the exclusion set forth in [Section 102(2)(iv)] applies only to those persons or companies that furnish the CMRS itself and does not, by its terms, address those that operate facilities that are used to provide CMRS that do not, themselves, furnish CMRS." *Id.* For these reasons, the Commonwealth Court reversed the PUC because its recent interpretation of Section 102(2)(iv) to exclude DAS networks as public utilities on the basis that they furnish CMRS "is not supported by the plain language of the Code or the principles of statutory construction, the precedent of [the Commonwealth Court], the determinations of public utility commissions in other jurisdictions, or the *2014 Wireless Infrastructure Order*." *Id.*

This Court granted the PUC's petition for allowance of appeal to consider:

(1) Did the Commonwealth Court err in holding, based on its misinterpretation and misapplication of a federal court case, that the PUC was not entitled to deference as to its expert interpretation of its enabling statute?

(2) On a question of first impression involving the jurisdictional status of operators of Distributed Antenna Systems, did the Commonwealth Court commit an error of law by determining that the PUC's interpretation of the definition of "public utility" and the statutory exclusion for wireless service was inconsistent with the statutory language and rules of statutory construction?

(3) Did the Commonwealth Court commit an error of law by determining that the Commission's finding that Distributed Antenna Systems are not jurisdictional public utilities was inconsistent with the Commonwealth Court's precedent and federal law?

*Crown Castle NG E. LLC v. Pa. Pub. Util. Comm'n*, 200 A.3d 7 (Pa. 2019) (per curiam).

As these issues require statutory interpretation, our standard of review is de novo, and our scope of review is plenary and non-deferential. *Harmon v. Unemployment Comp. Bd. of Review*, 207 A.3d 292, 298 (Pa. 2019). When engaging in statutory construction, a court's duty is to give effect to the legislature's intent and to give effect to all of a statute's provisions. 1 Pa.C.S. § 1921(a). The best indication of legislative intent is the plain language of the statute. *Matter of Private Sale of Prop. by Millcreek Twp. Sch. Dist.*, 185 A.3d 282, 290-91 (Pa. 2018). In ascertaining the plain meaning, we consider the statutory language in context and give words and phrases their "common and approved usage." *Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*, 194 A.3d 1010, 1027 (Pa. 2018). When statutory language is clear and unambiguous, courts must give effect to the words of the statute and must not disregard the text to implement its objective. *Id.*; 1 Pa.C.S. § 1921(b). "Only if the statute is ambiguous, and not explicit, do we resort to other means of discerning legislative intent." *Millcreek Twp. Sch. Dist.*, 185 A.3d at 291; 1 Pa.C.S. § 1921(c). When a statute is ambiguous, a court may ascertain the intention

of the legislature by looking at, among other things, administrative interpretations of the statute. 1 Pa.C.S. § 1921(c)(8).

We first consider whether the Commonwealth Court erred in holding that the PUC's interpretation of Section 102 was not entitled to much deference. The PUC argues that the Commonwealth Court failed to accord proper deference to its interpretation of the statute it is responsible for enforcing. The PUC asserts the Commonwealth Court's reliance on *Mazza* was erroneous. The PUC reads *Mazza* as permitting an agency "'to adapt [its] rules and policies to the demands of changing circumstances'" and affording deferential review to an agency's newly altered rules and policies if the agency can show it applied "'a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.'" PUC's Brief at 34-35 (quoting *Mazza*, 903 F.2d at 958-59). In support of its reading of *Mazza*, the PUC notes that the Third Circuit explained that *Mazza* does not freeze an agency's interpretation but requires a reasoned decision to support an altered interpretation. *Id.* at 35-36 (citing *Sacred Heart Med. Ctr. v. Sullivan*, 958 F.2d 537, 544 (3d Cir. 1992)). Accordingly, the PUC contends it was entitled to deference under *Mazza* because its decision was "well-reasoned, deliberate, and was made only after considering comments from interested parties."[8] *Id.* at 36.

Contrary to the Commonwealth Court's reliance on *Mazza* to conclude PUC's new interpretation was not entitled to deference, the PUC claims a number of this Court's decisions stand for the principle that an agency's statutory interpretation is entitled to

---

[8] Similarly, Intervenors, the Pennsylvania Municipal League, Pennsylvania State Association of Township Supervisors, Pennsylvania State Association of Boroughs, and Pennsylvania State Association of Township Commissioners (collectively, Municipal Parties), distinguish *Mazza* on the basis that *Mazza* involved an administrative agency employee's departure from the agency's prior policy without reasoned justification. Municipal Parties' Brief at 8. The difference between *Mazza* and this case, the Municipal Parties argue, is that this case involves a change of circumstance, which is the PUC deciding to examine whether DAS operators are public utilities, and the PUC's decision was the result of a deliberative process, not arbitrarily rendered. *Id.* at 9.

"great deference." *Id.* at 36-37 (relying on *Alpha Auto Sales v. Dep't of State*, 644 A.2d 153, 155 (Pa. 1994)). The PUC argues that this Court recently relied on *Alpha Auto Sales* to conclude that it is legal error for the Commonwealth Court to summarily disregard an agency's interpretation of a statute it administers. *Id.* at 37 (discussing *Snyder Bros. v. Pa. Pub. Util. Comm'n*, 198 A.3d 1056, 1079 (Pa. 2018)). According to the PUC, this Court has consistently given deference to an agency when it is interpreting a technically complex statutory scheme. *Id.* at 37-38 (relying on *Popowsky v. Pa. Pub. Util. Comm'n*, 706 A.2d 1197 (Pa. 1997)). Moreover, the PUC states this Court has previously held that "an agency may revise its policies and amend its regulations in interpreting its statutory mandates. Further, past interpretation of a statute, though approved by the judiciary, does not bind the Commission to that particular interpretation." *Id.* at 38 (quoting *Elite Indus. v. Pa. Pub. Util. Comm'n*, 832 A.2d 428, 431-32 (Pa. 2003)). Applying these cases, the PUC argues the Commonwealth Court's decision "has essentially eliminated the judicial doctrine by which appellate courts defer to an agency's interpretation of a statute for which [it] has enforcement responsibility." *Id.* at 39. Instead, the PUC urges this Court to adopt a deference standard that would permit an agency to respond to changing times by revising and correcting its prior interpretation of a statute based on reasoned justifications.[9] *Id.*

Crown Castle argues that the PUC's interpretation of an unambiguous statutory provision is not entitled to judicial deference. Crown Castle's Brief at 19. Crown Castle maintains that statutory construction is a judicial function, and courts must disregard an agency's interpretation that is inconsistent with a statute's plain language. *Id.* at 20. In

---

[9] The Municipal Parties also contend that the Commonwealth Court erred by not affording substantial deference to PUC's interpretation of its technically complex enabling statute. Municipal Parties' Brief at 6-10.

support of its position, Crown Castle quotes this Court's discussion of deference to an agency's statutory interpretation:

> While courts traditionally accord the interpretation of the agency charged with administration of the act some deference, the meaning of a statute is essentially a question of law for the court, and, when convinced that the interpretative regulation adopted by an administrative agency is unwise or violative of legislative intent, courts disregard the regulation.

*Id.* (quoting *Phila. Suburban Corp. v. Commonwealth, Bd. of Fin. & Revenue*, 635 A.2d 116, 118 (Pa. 1993)). Based on the PUC's concessions in this case that Section 102's language is clear, Crown Castle contends the PUC does not have the discretion to disregard the legislature's plain intent.[10] *Id.* Accordingly, Crown Castle argues this Court should decide this question of law without deferring to the PUC's interpretation. *Id.*

Crown Castle further contends that an agency's reversal of its prior interpretation of a statute is due less deference than on issues of first impression. *Id.* at 30. Crown Castle concedes that in some cases the PUC's interpretation of the Code may be entitled to some level of deference but disagrees with PUC's contention that its interpretations are essentially insulated from judicial review. *Id.* at 29-30. Responding to the PUC's criticism of the Commonwealth Court's reliance on *Mazza*, Crown Castle asserts the Commonwealth Court properly relied on its decision in *Dauphin County* and did not create a new deference standard. *Id.* at 30. Crown Castle explains that in *Dauphin County*, the court explained that the PUC is entitled to deference where the legislature has not addressed the issue, but the PUC is not given deference if the statute is unambiguous.

---

[10] Similarly, Intervenor Extenet Systems, Inc. argues the DAS Order in this case is an interpretive statement that is not entitled to the same level of deference that is given to formal agency rulemakings or adjudications. Extenet's Brief at 13-14 (quoting *Nw. Youth Servs., Inc. v. Commonwealth, Dep't of Welfare*, 66 A.3d 301 (Pa. 2013) (stating the validity of an interpretive rule turns on the willingness of a court to conclude the rule tracks the meaning of the statute)).

*Id.* at 31. The *Dauphin County* Court bolstered its conclusion by noting that the PUC's interpretation had changed, which the court stated was permissible but also not entitled to very much deference. *Id.* (quoting *Dauphin County*, 123 A.3d at 1135). According to Crown Castle, the Commonwealth Court used the same standard in this case, and it correctly decided the PUC's changing interpretation was not entitled to the level of deference the PUC sought. *Id.* at 33. The reduced deference was especially warranted, in Crown Castle's view, because the PUC's interpretation is not longstanding and was not contemporaneous with the enactment of the Code; instead, the PUC's interpretation shifted while the Code's language regarding public utilities remained the same. *Id.* at 33-34 (distinguishing this case from *Alpha Auto Sales*).

Responding to the PUC's assertion it is due deference under *Mazza*, Crown Castle argues PUC's justification for altering its interpretation was not reasonable or supported by the record. *Id.* at 34. Crown Castle points out that DAS technology has existed for at least 15 years, and PUC had been certificating DAS networks for over 10 years. *Id.* at 36. Along these lines, Crown Castle states that from its initial application (filed as "NextG") to the PUC until now, the components of its networks have not changed nor has its description of its services. *Id.* at 36-37. Accordingly, Crown Castle submits that there has not been any technological evolution that would justify the PUC's shifting interpretation of Section 102. *Id.* at 37.

In its reply brief, the PUC characterizes its DAS Order as an adjudication entitled to deference. PUC's Reply Brief at 10. The PUC notes Title 2 of the Pennsylvania Consolidated Statutes define an "adjudication" as "'any final order, decree, decision, determination or ruling by an agency affecting personal or property rights, privileges, immunities, duties, liabilities or obligations of any or all of the parties to the proceeding in which the adjudication is made.'" *Id.* (quoting 2 Pa.C.S. § 101). Explaining that its DAS

Order concluded DAS network operators furnish wireless telecommunications services, which ended the PUC's investigation, and applied to all interested stakeholders, the PUC contends the DAS Order is a valid adjudication. *Id.* at 11-12. Accordingly, the PUC asks this Court to give its decision, which turned on its interpretation of its enabling statute, proper deference. *Id.* at 12.

After careful consideration, we conclude that the Commonwealth Court correctly determined that the PUC's interpretation of Section 102 of the Code was not entitled to deference. A court does not defer to an administrative agency's interpretation of the plain meaning of an unambiguous statute because statutory interpretation is a question of law for the court. This Court has differentiated between the two rule-making functions of an administrative agency and the level of deference afforded to each:

> There is a well-recognized distinction in the law of administrative agencies between the authority of a rule adopted by an agency pursuant to what is denominated by the textwriters as *legislative* rule-making power and the authority of a rule adopted pursuant to *interpretative* rule-making power. The former type of rule 'is the product of an exercise of legislative power by an administrative agency, pursuant to a grant of legislative power by the Legislative body,' and 'is valid and is as binding upon a court as a statute if it is (a) within the granted power, (b) issued pursuant to proper procedure, and (c) reasonable.' K. C. Davis, 1 Administrative Law Treatise s 5.03, at 299 (1958). A court, in reviewing such a regulation, 'is not at liberty to substitute its own discretion for that of administrative officers who have kept within the bounds of their administrative powers. To show that these have been exceeded in the field of action . . . involved, it is not enough that the prescribed system of accounts shall appear to be unwise or burdensome or inferior to another. Error or unwisdom is not equivalent to abuse. What has been ordered must appear to be 'so entirely at odds with fundamental principles . . . as to be the expression of a whim rather than an exercise of judgment.['] *American Telephone & Telegraph Co. v. United States*, 299 U.S. 232 (1936). *See also Seattle First National Bank v. United States*, 44 F.Supp. 603, 607 (E.D. Wash.1942); *In re Da Lomba's Case*, 227 N.E.2d 513, 517 (Mass. 1967) ('rules which have been promulgated

pursuant to a legislative grant of power generally have the force of law. . . .'); *Barry Laboratories v. Wisconsin Board of Pharmacy*, 132 N.W.2d 833 (Wis. 1965); *Duke Molner Wholesale Liquor Co. v. Martin*, 180 Cal.App.2d 873 (19[60]), *cert. denied*, 364 U.S. 870 (1960) ('An administrative rule which is legislative in character is subject to the same test with reference to its validity as is an act of the Legislature. . . .'); Report of the U.S. Attorney General's Commission on Administrative Procedure 99-100 (1941).

An interpretative rule on the other hand depends for its validity not upon a law-making grant of power, but rather upon the willingness of a reviewing court to say that it in fact tracks the meaning of the statute it interprets. While courts traditionally accord the interpretation of the agency charged with administration of the act some deference, the meaning of a statute is essentially a question of law for the court, and, when convinced that the interpretative regulation adopted by an administrative agency is unwise or violative of legislative intent, courts disregard the regulation.

*Pa. Human Relations Comm'n v. Uniontown Area Sch. Dist.*, 313 A.2d 156, 169 (Pa. 1973) (parallel citations omitted).

"While an agency's interpretation of an ambiguous statute it is charged with enforcing is entitled to deference, courts' deference never comes into play when the statute is clear." *Seeton v. Pa. Game Comm'n*, 937 A.2d 1028, 1037 (Pa. 2007); *see also* 1 Pa.C.S. § 1921(c)(8) (providing a court interpreting an ambiguous statute may consider an agency's interpretation of it). In this case, the PUC acknowledges Section 102 of the Code is clear and unambiguous. PUC's Brief at 41 (contending "[t]he definition of public utility and the relevant wireless telecommunications/CMRS exclusion set forth in the Code does not require the application of principles of statutory construction because the language is clear."). As discussed below, we agree that Section 102 is unambiguous.

Nonetheless, the PUC maintains that its interpretation is entitled to "great deference," relying on *Alpha Auto Sales*, *Snyder Brothers*, *Popowsky*, and *Elite Industries.* Those cases, however, did not involve an agency's interpretation of an

unambiguous statute and are distinguishable from this case. In *Alpha Auto Sales* and *Snyder Brothers*, this Court gave deference to the agencies' constructions of ambiguous statutes. *See Alpha Auto Sales*, 644 A.2d at 155 (explaining the term "new" vehicle in the Board of Vehicles Act was ambiguous and giving deference to the agency's interpretation); *Snyder Bros.*, 198 A.3d at 1073, 1077 (finding the term "any" in the Oil and Gas Act ambiguous and employing statutory construction principles, including consulting the agency's interpretation). In *Popowsky*, this Court first interpreted the statute at issue, agreeing with the PUC's construction, and then held that the Commonwealth Court exceeded its scope of review by not upholding the PUC's interpretation, which was reasonable and not clearly erroneous. *Popowsky*, 706 A.2d at 1202-03. The *Popowsky* Court further stated that "[j]udicial deference is even more necessary when the statutory scheme is technically complex, as it is in this case." *Id.* at 1203. Lastly, the *Elite Industries* Court deferred to the PUC's amendment of a regulation, not its interpretation of a statute. *Elite Industries*, 832 A.2d at 483-84 (concluding "[t]his situation falls squarely within the PUC's area of expertise and is best left to the commission's discretion."). Contrary to the PUC's argument in this case, these cases do not stand for the proposition that an agency's interpretation of an unambiguous statute is entitled to deference. Instead, they illustrate that deference is appropriate when a statute is ambiguous or when the statutory scheme is complex and falls within the agency's area of expertise. Because this case involves the construction of an unambiguous statute, we do not defer to the PUC's interpretation. *See Gen. Motors, LLC. v. Bureau of Prof'l & Occupational Affairs*, 212 A.3d 40, 48 (Pa. 2019) ("In all events, this Court has maintained its role as the final arbiter in matters of statutory construction.").

Moreover, the level of deference a court gives to an administrative agency's interpretation of an unambiguous statute is not affected by the consistency of the

agency's interpretation, but on the interpretation's adherence to the language of the statute. The Commonwealth Court relied on *Mazza* for the principle that an agency's revised interpretation of a statute is not entitled to much deference. *Crown Castle*, 188 A.3d at 631; *see also Mazza*, 903 F.2d at 958-59 (explaining courts typically reject an administrative interpretation that "'flatly contradicts the position which the agency had enunciated at an earlier date, closer to the enactment of the governing statute.'"). Following *Mazza*, the Third Circuit reaffirmed its explanation that inconsistent administrative interpretations are given lower deference, but an agency is not "locked into the first interpretation it espouses" as long as the agency provides a "'reasoned justification'" for its revision. *Sullivan*, 958 F.2d at 543. In *Sullivan*, Sacred Heart Hospital sought Medicare reimbursement from the Secretary of Health and Human Services for the hospital's increased operating costs resulting from an expansion of its facilities. *Id.* at 539. The agency denied the reimbursement because the plain language of the governing statute did not permit it, even though the agency had previously interpreted the same statute differently. *Id.* at 542. Upholding the agency's decision, the Third Circuit set forth the United States Supreme Court's pronouncement on the deference afforded to an agency's construction of the statute it administers:

> First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.[9] If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.
> -------------------------------------------------------------------------------

[9] The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.

*Id.* at 544 (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984) (some footnotes omitted)).[11]

Applying *Chevron*, the Third Circuit found that the agency provided a "reasoned justification" for its revised interpretation, in that the agency conceded its prior interpretation was erroneous and its new interpretation gave effect to the plain language of the statute. *Id.* at 545. Examining the plain meaning of the statute, the Third Circuit agreed with the agency's interpretation. *Id.* at 546. Thus, the federal precedent is consistent with our conclusion that an agency must follow the plain language of an unambiguous statute, and courts will not defer to its interpretation of a clear statute. This is true regardless of whether the agency's interpretation has changed over time; the touchstone is whether the agency's interpretation adheres to the clear meaning of the statute. As we have repeatedly admonished, "the meaning of the statute is ultimately a question of law for the reviewing court." *Borough of Pottstown v. Pa. Mun. Ret. Bd.*, 712 A.2d 741, 744 (Pa. 1998). Accordingly, the Commonwealth Court did not err in concluding the PUC's interpretation of Section 102 was not entitled to deference.

Having concluded the PUC's interpretation of Section 102 is not entitled to deference, we now examine whether the Commonwealth Court erred in determining that the PUC's interpretation of the definition of "public utility" was inconsistent with the language of Section 102. To resolve this issue, the PUC contends that we do not need to resort to the principles of statutory construction because the language of Section 102

---

[11] While this Court has never expressly adopted the federal *Chevron* approach, we have recognized that "[t]he *Chevron* approach to such cases at the federal level, however, is indistinguishable from our own approach to agency interpretations of Commonwealth statutes." *Seeton*, 937 A.2d at 1037 n.12.

is clear and unambiguous.[12] PUC's Brief at 41. Examining Section 102(1)(vi)'s definition of public utility, the PUC notes that it has jurisdiction over point-to-point services, including microwave point-to-point service, and backhaul transport services. *Id.* Additionally, the PUC reads Section 102(2)(iv) as excluding from its jurisdiction "a person or corporation furnishing mobile domestic cellular radio telecommunications service or CMRS[.]" *Id.* Because the DAS transport services use antennae that directly receive wireless RF signals from mobile devices, the PUC contends that the DAS networks "indirectly" furnish CMRS. *Id.* at 42. The PUC argues "[t]o assert that a person or corporation that operates radio frequency transmission equipment fundamental to the furnishing of CMRS is itself not *furnishing* CMRS is an absurd and unreasonable interpretation of the statutory section and effectively nullifies the CMRS exclusion." *Id.* at 47 (emphasis in original). Thus, according to the PUC an entity that "facilitates" the furnishing of CMRS is equivalent to the entity that furnishes CMRS "outright."[13] *Id.*

---

[12] In contrast to the PUC, the Municipal Parties argue Section 102 is ambiguous because it does not expressly state whether wholesale CMRS providers are excluded from its definition of public utility. Municipal Parties' Brief at 11. Municipal Parties assert wholesale CMRS providers, like retail CMRS providers, should be excluded to avoid the unreasonable result of subjecting retail and wholesale CMRS providers to different rights and regulations even though they use identical equipment and provide identical services. *Id.*

[13] Unlike the PUC and the Municipal Parties, the Communications Workers of America (CWA), in its amicus brief, does not equate Section 102(2)(iv)'s use of the phrase "mobile domestic cellular radio telecommunications service" with CMRS. Instead, CWA notes "service" is defined by the Code as, *inter alia*, "any and all facilities used, furnished, or supplied by public utilities . . . in the performance of their duties under this part[.]" CWA's Amicus Brief at 6 (quoting 66 Pa.C.S. § 102). CWA's position is that regardless of which entity owns the DAS network equipment, "privately owned facilities used to provide utility service, or that otherwise become part of the utility's network, are considered to be facilities of the public utility that are subject to regulation by the Commission." *Id.* at 8 (relying on *Overlook Dev. Co. v. Pa. Pub. Serv. Comm'n*, 101 Pa. Super. 217 (1931), *Lehigh Nav. Coal Co. v. Pa. Pub. Util. Comm'n*, 1 A.2d 540 (Pa. Super. 1938), and *Rogoff v. Buncher Co.*, 151 A.2d 83 (Pa. 1959)). As such, CWA argues that DAS networks are

In contrast, Crown Castle stresses the focus of the Section 102(2)(iv) exclusion is on the service provided, not the equipment used to provide that service. Crown Castle's Brief at 22. According to Crown Castle, the PUC has consistently conflated the service with the equipment as is evident in its initial order stating "[o]ur statute excludes from our jurisdiction any person that operates equipment that 'furnishes mobile domestic cellular radio telecommunications service.'" Crown Castle's Brief at 21 (quoting DAS Order at 18) (emphasis omitted). However, Crown Castle points out that Section 102(2)(iv) does not refer to operating equipment. *Id.* at 22. Instead, it focuses on whether a company furnishes mobile domestic cellular radio telecommunications service.[14] *Id.* As such, Crown Castle asserts the PUC impermissibly added words to Section 102(2)(iv), which expanded the scope of the exclusion. *Id.* (explaining this Court has precluded reading words into a statute in order to change the meaning of the statute in *Pa. Sch. Bds. Ass'n v. Commonwealth, Pub. Sch. Employees' Ret. Bd.*, 863 A.2d 432, 439 (Pa. 2004)). Crown Castle posits that Section 102(2)(iv) reflects the legislature's intent to "regulate different services differently, not on the basis of their equipment." *Id.* at 28.

Reading Sections 102(1)(vi) and 102(2)(iv), Crown Castle maintains it is a public utility that is not excluded because it does not furnish CMRS. *Id.* at 46. Crown Castle points out that it is undisputed that it meets the Section 102(1)(vi) definition of "public utility," as the DAS Order recognized. *Id.* (citing DAS Order at 14). Turning to Section

part of the WSPs' networks, and third-party ownership does not affect the regulatory treatment of DAS operators. *Id.* at 9-11.

[14] Similarly, ExteNet contends the PUC incorrectly focused on whether DAS networks are used to furnish CMRS instead of on whether DAS operators actually furnish CMRS. ExteNet's Brief at 20. ExteNet argues that a plain reading of Section 102 reveals a bright line test: if an entity is furnishing CMRS, it is not a public utility. *Id.* at 21. While acknowledging that DAS networks are used by WSPs to provide retail CMRS, it is the WSPs that actually furnish the CMRS service. *Id.* at 23-24. Accordingly, ExteNet maintains the DAS networks are not excluded from the definition of "public utility" because they do not furnish CMRS. *Id.* at 24.

102(2)(iv)'s exclusion of an entity that "furnishes mobile domestic cellular radio telecommunications service," Crown Castle agrees with the PUC that the term is synonymous with the federally-defined CMRS. *Id.* Crown Castle contends it is not a CMRS because the FCC defines a "mobile service" as "a radio communication service carried on between mobile stations or receivers and land stations, and by mobile stations communicating among themselves," and Crown Castle asserts it does not transmit data by radio but by wireline fiber optic cables. *Id.* at 47 (citing 47 U.S.C. § 153(33); 47 C.F.R. § 20.3). Crown Castle argues that all radio transmissions are controlled and provided by its WSP customers and, therefore, it is not a CMRS.[15] *Id.*

In its reply brief, the PUC maintains its interpretation did not add words to Section 102(2)(vi). PUC's Reply Brief at 21. The PUC argues that non-jurisdictional wireless service cannot be furnished without transporting RF signals, either to or from the end users' mobile devices to the WSP. *Id.* at 22-23. According to the PUC, "the transport functionality being provided to consumers is the furnishing of wireless telecommunications service to Pennsylvania consumers which, by statute, is excluded from the definition of jurisdictional telecommunications service." *Id.* at 23 (emphasis omitted). In the PUC's view, the identity of the entity transporting RF signals is irrelevant, and the Commonwealth Court's contrary conclusion produces an absurd result in contravention of 1 Pa.C.S. § 1922(1). *Id.* at 24.

The PUC contends the record supports its view that DAS network operators furnish wireless telecommunications service. *Id.* at 13. It notes that the DAS operators' technical

---

[15] Crown Castle disagrees with the Municipal Parties' interpretation of Section 102. Crown Castle's Brief at 58. It notes the Code does not distinguish between wholesale CMRS and retail CMRS. *Id.* Further, Crown Castle explains wholesale CMRS refers to a WSP leasing its CMRS spectrum capacity to another company, and its DAS networks do not have the necessary spectrum to provide wholesale CMRS. *Id.* (citing Reply Comments of Crown Castle, 5/16/16, at 5-6).

descriptions of their networks acknowledge they transport over-the-air RF signals between mobile devices and a WSP's closest aggregation point. *Id.* The PUC contends the ownership of the RF signals is irrelevant to its conclusion that DAS network operators transport those signals, which is a wireless telecommunications service. *Id.* at 14.

We conclude that the Commonwealth Court's interpretation of Section 102, holding DAS network operators meet the Section 102(1)(vi) definition of "public utility" and are not excluded from the definition by Section 102(2)(iv), was consistent with the plain language of the statute. Section 102(1)(vi) defines a "public utility" as:

> (1) Any person or corporation now or hereafter owning or operating in this Commonwealth equipment or facilities for:
>
> . . .
>
> (vi) Conveying or transmitting messages or communications, except as set forth in paragraph (2)(iv), by telephone or telegraph or domestic public land mobile radio service including, but not limited to, point-to-point microwave radio service for the public for compensation.

66 Pa.C.S. § 102(1)(vi). Significantly, there is no dispute that DAS network operators meet Section 102(1)(vi)'s definition of a "public utility" as corporations that own or operate equipment or facilities for conveying or transmitting communications. *See* DAS Order at 14; Crown Castle's Brief at 46. From the description of the DAS networks' services, it is clear that their facilities transmit or transport messages from a node to a hub. Further, Section 102(1)(vi) clearly contemplates some wireless transmission services will qualify as public utilities because it includes "point-to-point microwave radio service," which is a form of wireless transmission, as its only illustration of a public utility. Because we conclude that DAS network operators meet Section 102(1)(vi)'s definition of "public utility," the question becomes whether Section 102(2)(iv) excludes DAS networks from the definition.

The exclusion in Section 102(2)(iv) provides: "(2) the term ["public utility"] does not include: . . . (iv) [a]ny person or corporation, not otherwise a public utility, who or which furnishes mobile domestic cellular radio telecommunications service." 66 Pa.C.S. § 102(2)(iv). As the Commonwealth Court observed, the Section 102(2)(iv) exclusion does not contain the language "owning or operating . . . equipment or facilities." *Crown Castle*, 188 A.3d at 632. However, the PUC's interpretation adds this language to the exclusion. The PUC's argument to this Court is that the DAS network operators "indirectly" furnish CMRS because they operate equipment that facilitates another company's ability to furnish CMRS. PUC's Brief at 42, 47. We agree with the Commonwealth Court that adding these words to the exclusion is impermissible as it "expand[s] its application to entities that do not fall within the plain language of the statutory exclusion." *Crown Castle*, 188 A.3d at 632 (relying on the principle of 1 Pa.C.S. § 1923(c) that words and phrases may not be added to a statute in a manner that affects its scope and operation). The plain language of the statute excludes only entities that actually provide mobile domestic cellular radio telecommunications service, or CMRS. As the federal regulations clarify, a CMRS is a for-profit service both available to the public, or a substantial portion of the public, and an "interconnected service." 47 C.F.R. § 20.3 (defining CMRS). An "interconnected service" is one "[t]hat is interconnected with the public switched network, or interconnected with the public switched network through an interconnected service provider, that gives subscribers the capability to communicate to or receive communication from all other users on the public switched network[.]" *Id.* (defining interconnected service). Here, the DAS network operators provide services to WSPs and do not have a business relationship with the WSP's customers, *i.e.*, the CMRS subscribers. As such, the DAS network operators do not provide an "interconnected service" because they do not "give[] subscribers the capability to communicate to or

receive communication from all other users on the public switched network[.]" *Id.* Therefore, the DAS network operators' service in this case is not a CMRS under the federal regulations nor a synonymous "mobile domestic cellular radio telecommunications service" under Section 102(2)(iv). Section 102(2)(iv) does not exclude an entity that owns or operates equipment or facilities that assists another company in furnishing CMRS. Accordingly, the Commonwealth Court correctly determined that the PUC's interpretation was inconsistent with the plain language of Section 102.

Lastly, we examine whether the Commonwealth Court's separate holding that DAS network operators were not excluded from the definition of "public utility" is inconsistent with its precedent and federal law. The PUC contends that the technology at issue in the Commonwealth Court's *Rural Telephone* decision is distinguishable from the DAS network technology involved in this case. PUC's Brief at 54. The PUC argues *Rural Telephone*'s conclusion that wireline backhaul transport service was a public utility cannot support a similar conclusion in this case that wireless RF transmissions over DAS networks from mobile devices to a hub also provide backhaul transport. *Id.* Moreover, the PUC maintains the Commonwealth Court's opinion in this case produces an absurd result because its classification of a public utility is contingent on the ownership of the DAS network: all parties agree that a CMRS provider that builds its own DAS facilities to boost its network does not qualify as a public utility; however, if that CMRS provider leases a neutral host's DAS network, it is a public utility according to the Commonwealth Court. *Id.* at 55-56.

Looking to federal law, the PUC argues the FCC has classified DAS facilities as wireless while rejecting the argument that DAS networks are akin to backhaul transport services. *Id.* at 56. In support of its position, the PUC quotes the following portion of the FCC's 2014 Wireless Infrastructure Order:

> Some commenters argue that the shot clocks should not apply because some providers describe DAS and small-cell deployments as wireline, not wireless, facilities. The City of Eugene, Oregon, for example, argues that the Commission should not consider DAS a personal wireless service because one DAS provider has argued that its service is "no different from, and indeed competes directly with, the fiber-based backhaul/private line service provided by Incumbent Local Exchange Carriers." This argument is not persuasive. Determining whether facilities are "personal wireless service facilities" subject to Section 332(c)(7) does not rest on a provider's characterization in another context; rather, the analysis turns simply on whether they are facilities used to provide personal wireless services.

*Id.* (quoting *2014 Wireless Infrastructure Order*, 29 FCC Rcd. at 12973, ¶ 271). With this analysis, the PUC states the FCC found that DAS facilities are "'facilities for the provision of personal wireless services.'" *Id.* at 58 (quoting 47 U.S.C. § 332(c)(7)(C)(ii)). The PUC further asserts the FCC's analysis supports its determination that DAS network operators are furnishing CMRS because a DAS network's antenna is a facility that provides personal wireless service. *Id.* at 60. Further, the PUC contends the Commonwealth Court erred in relying on decisions from Texas and California because the statutory definition of a public utility varies by jurisdiction, and the Commonwealth Court did not compare Section 102 to those jurisdictions' statutes. *Id.* at 63.

Crown Castle maintains the Commonwealth Court correctly concluded that the PUC's DAS Order conflicts with its precedent and the FCC's precedent. Crown Castle's Brief at 38. Analyzing *Rural Telephone*, Crown Castle reads its holding as "a provider of telecommunications service does not assume the regulatory status of its customers." *Id.* Instead of focusing on the customer's service, Crown Castle explains *Rural Telephone* as focusing on the provider's service. *Id.* at 39. In *Rural Telephone*, according to Crown Castle, the Commonwealth Court found that providing fiber optic transport services to ISPs did not also make the company a non-jurisdictional "'wholesale ISP.'" *Id.* at 38-39. Applying *Rural Telephone* to this case, Crown Castle emphasizes that its DAS network

service is distinct from its WSP customers' service. *Id.* at 39 (arguing "the key distinction the PUC repeatedly ignores is that DAS network operators offer a service *to* CMRS providers that is separate and distinct from the service offered *by* those CMRS providers." (emphasis in original)). In support of this point, Crown Castle notes that it does not have relationships with end-user CMRS consumers and it cannot replace the CMRS that its WSP customers provide to end-users. *Id.* "Although Crown Castle's DAS networks, on some level, facilitate the provision of CMRS service by others, there will always have to be a separate CMRS service provider furnishing the service to the end users[.]" *Id.* at 39-40. Accordingly, Crown Castle concludes the Commonwealth Court properly applied the principles of *Rural Telephone* to this case. *Id.* at 42.

Next, Crown Castle agrees with the Commonwealth Court's analysis of the FCC's *2014 Wireless Infrastructure Order*. *Id.* Crown Castle maintains the FCC did not find DAS network operators provide "personal wireless service," only that when a provider of personal wireless service uses DAS facilities those DAS facilities are classified as "personal wireless service facilities." *Id.* Crown Castle explains the PUC's error is not distinguishing between facilities and services.[16] *Id.* at 43. Because the Commonwealth Court drew the same distinction as the FCC, Crown Castle urges this Court to affirm the Commonwealth Court. *Id.* at 43.

The PUC, in its reply brief, reiterates that the terrestrial, wireline wholesale backhaul transport of ISP traffic involved in *Rural Telephone* is distinguishable from the over-the-air RF signal transmission at issue in this case. PUC's Reply Brief at 15-19.

---

[16] ExteNet states that "for an entity to provide CMRS, the entity must be licensed by the FCC in accordance with 47 C.F.R. § 20.9 and must possess wireless spectrum . . . . Without such a license from the FCC, and without wireless spectrum, it is impossible for DAS operators to furnish CMRS." ExteNet's Brief at 30.

Here, we conclude the Commonwealth Court's finding that DAS network operators are public utilities is consistent with the Commonwealth Court's precedent and federal law. First, the Commonwealth Court's decision in this case is supported by its prior decision in *Rural Telephone*. In *Rural Telephone*, the Commonwealth Court affirmed the PUC's decision to certify Core Communications as a public utility providing telecommunications services. *Rural Tel.*, 941 A2d at 752. Core's services connected its Internet Service Provider (ISP) customers to the Public Switched Telephone Network. *Id.* at 753. The objectors to Core's application argued, in part, that Core was a wholesale ISP, not a telecommunications service. *Id.* at 753-54. The Commonwealth Court rejected this argument, reasoning that the Code broadly defines "public utility," and "internet service is an information service, but [] the transmission path needed to provide that internet service is a telecommunication[s] service[.]" *Id.* at 758-59. Further, the court explained that Core facilitated the ISPs' service of dial-up internet access. *Id.* at 760 n.12.

We recognize that the technology the DAS network operators use in this case differs from the technology involved in *Rural Telephone*. However, we do not find that difference is controlling. Instead, the service the DAS network operators provide to their WSP customers is analogous to the service Core offered to its ISP customers, which the Commonwealth Court concluded was a public utility. *Rural Tel.*, 941 A.2d at 760. Just as Core "accept[ed] computer dial-up calls destined for the internet" and "change[d] the content of the call and grooms it to allow an end-user's computer to web browse or receive emails over the internet[,]" the DAS networks in this case receive RF signals from mobile devices, convert the RF signals to optical signals, and transport the signal to the WSPs' networks. *Id.* at 753-54. Like Core's transmission service facilitated the ISPs' dial-up internet service, the DAS networks' transportation service in this case facilitate the WSPs' CMRS. We agree with the Commonwealth Court that the facilitation of a non-jurisdictional

service is not equivalent to the actual furnishing of that non-jurisdictional service. *Crown Castle*, 188 A.3d at 635 (explaining "*Rural Telephone*[] recognized that the Code treats transmission services as telecommunications services that fall within the [PUC's] jurisdiction even if they transmit non-jurisdictional services[.]"). Accordingly, we find *Rural Telephone*'s conclusion that Core was properly certified as a public utility is consistent with the Commonwealth Court's reasoning in this case that the DAS networks are public utilities.

Second, the FCC's treatment of DAS networks confirms the Commonwealth Court's conclusion that DAS network operators are public utilities and are not furnishing CMRS. The FCC has consistently classified DAS networks as wireless infrastructure facilities. *See, e.g.*, *In re Comm'ns Marketplace Report*, 2018 WL 6839365, at *16 (FCC 2018) (stating "wireless infrastructure also includes distributed antenna systems (DAS) and small cells."). The FCC's *2014 Wireless Infrastructure Order* states DAS networks are "personal wireless service facilities," which is a term of art defined as "facilities for the provision of personal wireless services." *See 2014 Wireless Infrastructure Order*, 29 FCC Rcd. at 12973 ¶ 271); 47 U.S.C. § 332(c)(7)(C)(ii). The term "personal wireless services" is separately defined as "commercial mobile services, unlicensed wireless services, and common carrier wireless exchange access services." 47 U.S.C. § 332(c)(7)(C)(i). Thus, the FCC and the United States Code recognize that facilities used to provide personal wireless services are distinct from the actual provision of those services. Further, the FCC issued a 2018 Communications Marketplace Report, which discussed "facilities-based mobile wireless service providers," including AT&T, Sprint, T-Mobile, and Verizon Wireless, separately from "wireless infrastructure facilities," which includes "towers and other tall structures, such as lattice towers, guyed towers, monopoles, rooftops, water towers, and steeples, [and] distributed antenna systems (DAS) and small cells." *In re*

*Comm'ns Marketplace Report*, 2018 WL 6839365, at \*3, \*16. As discussed above, the third-party DAS network providers here operate wireless infrastructure facilities that do not provide personal wireless service even though the DAS networks ultimately increase the coverage of their WSP customers' networks. Therefore, we conclude the Commonwealth Court's conclusion that DAS networks do not provide personal wireless services is supported by FCC precedent.[17]

In summary, we agree with the Commonwealth Court that DAS network operators do not provide CMRS because DAS network operators "own no spectrum, need no phone numbers, and their contractual relationship is solely with the WSPs, not with the retail cell phone user. . . . [T]he DAS network operator has no control over the generation of that signal [that it transports for the WSPs]." *Crown Castle*, 188 A.3d at 633. Accordingly, we conclude that DAS network operators do not furnish CMRS and are not excluded from the definition of public utility by Section 102(2)(iv).

For these reasons, the decision of the Commonwealth Court is affirmed. We conclude the Commonwealth Court did not err in holding that the PUC's interpretation of a clear and unambiguous statutory provision was not entitled to deference. Further, the Commonwealth Court properly concluded that DAS network service meets the definition

---

[17] This conclusion is also consistent with the decisions of the Texas Public Utility Commission and the California Public Utilities Commission. Although the PUC points out the statutory definition of public utility varies by jurisdiction, it does not argue there are any meaningful differences between the Texas or California statutes and the Code. Further, although the definition of public utility may differ, those states' descriptions of the services offered by DAS networks is consistent with our understanding and supports our conclusion that DAS networks do not furnish CMRS. *See City of Houston*, 2017 WL 2079683, at \*4-5; *County of S.F.*, 2006 WL 151886, at \*3-4.

of "public utility" and is not excluded from that definition as it does not furnish CMRS service.

Chief Justice Saylor and Justices Baer, Todd, Donohue, Dougherty and Wecht join the opinion.

Justice Wecht files a concurring opinion.